## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

SCARLETT PAVLOVICH,

                Plaintiff,

      -against-                   C.A. NO. 1:25-CV-10263F

AMANDA PALMER,

            Defendant.

Plaintiff, by and through her undersigned counsel, respectfully alleges as follows:

## COMPLAINT

1.      This claim arises out of Neil Gaiman's sexual abuse of Plaintiff, and his wife Amanda Palmer's role in procuring and presenting Plaintiff to Gaiman for such abuse.

2.      The facts pled in this Complaint are of a highly sensitive nature, detailing sexual assault and abuse, and may be upsetting to some readers.

## PARTIES

3.      Plaintiff Scarlett Pavlovich is a citizen of New Zealand currently residing in Scotland.

4.      Defendant Amanda Palmer is either a citizen of the State of New York, residing in New York, or a citizen of the State of Massachusetts, residing in Lexington.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, in that it raises claims under the Trafficking Victim Protection Act, 18 U.S.C. §§ 1581 *et seq.*

6.      The Court has jurisdiction over Scarlett's non-statutory claims pursuant to 28 U.S.C. § 1367(a), in that those claims are so related to Scarlett's statutory claims that they form part of the same case or controversy under Article III of the United States Constitution

7.      Venue in this Court is appropriate in that 18 U.S.C § 1595 authorizes Scarlett to bring a civil action in any appropriate United States District Court, and 18 U.S.C. § 1391(b)(3) permits a civil action to be brought in "any judicial district in which any defendant is subject to the court's personal jurisdiction to such action."

8.      Upon information and belief, jurisdiction over Palmer is appropriate in either New York or Massachusetts, and Palmer may consent to jurisdiction in Wisconsin. Given the uncertainty regarding Palmer's state of residence, Plaintiff is simultaneously filing actions against Palmer in the United States District Courts for the Southern District of New York and the District of Massachusetts. Scarlett has also filed an action against Gaiman in the Western District of Wisconsin and has named Palmer as a Defendant in that action to allow Palmer to consent to jurisdiction there, if she prefers to litigate Scarlett's claims with Gaiman as a co-Defendant. Scarlett will proceed against Palmer only in the district of her choosing.

## FACTS

9.      Gaiman has a decades-long history of sexual misconduct consistent with the actions that will be described in the following paragraphs.

10.     This misconduct includes sexual contact with multiple women who have not consented to his actions.

11.     In cases where his victims submitted to sexual contact with Gaiman, his actions have often exceeded any consent that might have been granted.

12.     Gaiman's misconduct has spanned decades, commencing no later than 2007.

13.    In an effort to conceal his misconduct, Gaiman has entered into several

agreements to provide compensation to women he has victimized, in some cases for hundreds of

thousands of dollars.

14.    Palmer either is or was Gaiman's wife.

15.    Since at least 2015, Palmer has been aware of Gaiman's pattern of sexual

misconduct.

16.    Gaiman and Palmer separated in 2020 and have been locked in a divorce and

custody battle since.

17.    Gaiman and Palmer have a child.

**A.    Palmer Targets Scarlett**

18.    Scarlett met Palmer in Auckland, New Zealand, in 2020.

19.    Scarlett met Palmer in and around the time of the COVID pandemic outbreak.

20.    At the time, Scarlett was 22 years old.

21.    The two became acquaintances.

22.    Scarlett would occasionally visit Palmer at Palmer's house on Waiheke Island,

sometimes for planned events.

23.    Waiheke is an island located 16 miles from Auckland's central business district.

24.    Waiheke is only accessible from Auckland via a forty-minute ferry ride.

25.    That ferry costs over $40 NZD at its cheapest and up to $59 NZD to ride at peak

times.

26.    Scarlett would sometimes do personal tasks for Palmer, such as running errands,

babysitting, or helping with household chores.

27.    Scarlett was generally not paid for these tasks.

28.    Scarlett was economically insecure during this time.

3

29.    Scarlett had recently been unhoused and sleeping on the beach.

30.    Palmer was aware that Scarlett was economically insecure.

31.    Scarlett had also coped with substantial mental health difficulties over the years.

32.    Scarlett, who is a lesbian, was sexually assaulted by a 45-year-old man when she was 15 years old.

33.    Scarlett's more recent mental health challenges included significant anxiety related to her increasingly insecure housing situation.

34.    Palmer was aware that Scarlett had been suffering from mental health difficulties.

35.    Scarlett had discussed her mental health with Palmer at various times after the two became acquaintances.

**B.    A Promise of Employment**

36.    On February 1, 2022, Palmer asked Scarlett if Scarlett could babysit for the weekend.

37.    At the time, Palmer and Gaiman were separated and living in homes that were near each other, on Waiheke Island.

38.    Waiheke Island is an island near Auckland, New Zealand that many wealthy people favor as a residence because it is remote and difficult to access.

39.    Because Palmer and Gaiman lived in separate homes, babysitting for Palmer and Gaiman's child would entail spending time at both houses.

40.    Palmer promised Scarlett would be paid for doing this work.

41.    Scarlett agreed.

42.    On the afternoon of February 4, 2022, Scarlett arrived at Gaiman's house to babysit for Gaiman and Palmer's child.

43.    Scarlett spent an hour with the child.

44.     Gaiman then changed the plan for the evening.

45.     Gaiman decided that he would drop the child off at a friend's home and the child would later be returned to his house where Scarlett would watch the child.

46.     Palmer had purchased tickets for a film that evening, intending to go with Gaiman after the child had been dropped off at the playdate. Instead, she stayed in Auckland and suggested that Gaiman take Scarlett to the film after dropping the child off.

**C.     Gaiman Rapes Scarlett for the First Time**

47.     While waiting for the child's return, Gaiman gave Scarlett a tour of the grounds, pointing out features such as a bathtub in the garden and a fig tree, and picking a fig for Scarlett.

48.     Gaiman and Scarlett had dinner together that evening.

49.     The child was still at the home of the family friend.

50.     Gaiman provided Scarlett with wine but drank no alcohol himself.

51.     After dinner, Gaiman suggested that Scarlett bathe in the bathtub in the garden.

52.     Scarlett was initially unwilling to do so.

53.     Gaiman persisted in his suggestions and grew more insistent.

54.     Scarlett eventually agreed after Gaiman told her that he had to make a work call.

55.     Upon information and belief, there was no work call.

56.     Shortly after Scarlett began to bathe, Gaiman arrived unannounced.

57.     And naked.

58.     Gaiman got into the bathtub with Scarlett.

59.     Without being invited to do so.

60.     Scarlett was shocked and frightened by Gaiman's behavior.

61.     At that time Gaiman was 61 years old.

62.     Gaiman is significantly physically larger than Scarlett.

63.    Scarlett pulled her knees to her chest and curled her arms around them.

64.    Shortly after getting into the bathtub with Scarlett, Gaiman instructed her to stretch out.

65.    Scarlett was reluctant and expressed her reluctance.

66.    Gaiman repeated his command that she stretch out.

67.    Scarlett eventually stretched out.

68.    Gaiman began to stroke Scarlett's feet.

69.    Gaiman instructed Scarlett to come to his side of the tub, where "the view was better."

70.    Scarlett objected but eventually complied.

71.    Gaiman pulled Scarlett into his lap.

72.    Gaiman then penetrated Scarlett's rectum with his fingers.

73.    Scarlett objected.

74.    Gaiman also attempted to penetrate Scarlett's rectum with his penis.

75.    Scarlett objected.

76.    Gaiman asked to rub his penis on Scarlett's breasts.

77.    Scarlett objected.

78.    Gaiman asked Scarlett if he could ejaculate on Scarlett's face.

79.    Scarlett said no.

80.    Gaiman ejaculated on Scarlett's face.

81.    Gaiman instructed Scarlett to call him "Master."

82.    Gaiman called Scarlett a "good little girl."

83.    Scarlett attempted to clean herself in the water.

84.　　Gaiman watched.

85.　　While watching, Gaiman said words to the effect of "Amanda told me I couldn't have you."

86.　　Gaiman also said that as soon as Amanda said he could not have Scarlett, he knew he had to have Scarlett.

87.　　Palmer had told Gaiman that Gaiman could not have "this one."

88.　　Palmer had told Gaiman of Scarlett's mental health challenges.

89.　　Palmer had specifically informed Gaiman that Gaiman would seriously harm Scarlett if he abused her.

90.　　Palmer told Gaiman this because Palmer knew about Gaiman's history of sexual misconduct.

91.　　Palmer also told Gaiman this because Palmer knew about Gaiman's sexual predilections and need to humiliate his female sexual partners – with or without their consent.

92.　　Palmer also knew that Scarlett was an abuse survivor who had suffered mental health challenges in the remote and recent past.

93.　　Palmer was clearly aware of the danger that Gaiman posed to Scarlett.

94.　　Palmer said nothing to Scarlett about her concerns about what Gaiman would do.

95.　　Palmer said nothing to Scarlett about her knowledge of Gaiman's prior sexual misconduct.

96.　　Palmer said nothing to Scarlett about Gaiman's need to humiliate and degrade his female sexual partners because, as he put it, it was the only way he could "get off."

97.　　Palmer either knew or should have known that telling Gaiman he couldn't "have" Scarlett would fuel Gaiman's desire to "have" Scarlett as a sexual partner.

7

98.    Regardless of Scarlett's desire or consent.

99.    Palmer, in other words, either knew or should have known that she was marking Scarlett as prey in Gaiman's eyes.

100.    After the incident, Scarlett retreated to Palmer's house.

101.    That night had been Scarlett's first real physical contact with Gaiman.

102.    Until then, she was familiar only with his carefully cultivated reputation as a "feminist" who trusted – and could be trusted by – women.

103.    Scarlett could not sleep.

104.    She stayed up, searching the Internet for "Neil Gaiman MeToo," trying to reconcile what Gaiman had done to her with his reputation.

105.    Scarlett was looking for any information that would suggest that she was not Gaiman's first victim.

106.    She did not find any.

107.    Gaiman had bound previous victims with non-disclosure agreements when he settled their claims against him.

**D.    After the First Sexual Assault**

108.    Scarlett completed the weekend of babysitting.

109.    But she was not immediately paid.

110.    Or for months thereafter.

111.    After the weekend, Palmer, acting for herself and Gaiman, formally offered Scarlett a job as a live-in nanny.

112.    Scarlett, who was housing insecure at the time, was desperate for secure employment and affordable housing.

113.    She was not getting enough hours at her current job.

114.    Her lease was about to run out.

115.    She had been unable to find a new apartment she could afford.

116.    Palmer encouraged Scarlett to give up her prior job and housing to accept the role as live-in nanny.

117.    Gaiman promised Scarlett he would use his tremendous industry influence to promote her writing career.

118.    Scarlett accepted the job.

119.    The job required her to care for the child at both Palmer and Gaiman's houses.

120.    Palmer and Gaiman promised that Scarlett would be paid for the work.

121.    But Palmer and Gaiman did not pay Scarlett for the work.

122.    She was, in effect, an economic hostage to Palmer and Gaiman.

123.    During the time that Scarlett was working without pay, Gaiman repeatedly raped Scarlett.

124.    During the time that Scarlett was working without pay, Gaiman repeatedly sexually assaulted Scarlett.

125.    One rape occurred on February 14, 2022, and involved Gaiman forcing anal sex on Scarlett while smearing her with truffle oil.

126.    Gaiman knew that he was raping Scarlett.

127.    Scarlett screamed "I can't" and "no" at the start of the encounter.

128.    And continued to scream in pain through the entire encounter.

129.    At the conclusion of the anal sex, Gaiman ordered Scarlett to clean him up.

130.    With her tongue.

131.    Scarlett objected that it was unhygienic.

132.    Gaiman insisted.

133.    Gaiman said "don't make your master angry!"

134.    Scarlett then complied with Gaiman's order.

135.    Gaiman referred to the assault as a "Valentine's Day present."

136.    During another incident, Scarlett experienced severe pain during Gaiman's forcible sodomy.

137.    The pain was so overwhelming that Scarlett saw stars and lost consciousness.

138.    Scarlett later described the pain as "celestial" and "cosmic", because it caused stars to explode in her vision.

139.    Gaiman made no attempt to aid Scarlett.

140.    When she came to, Gaiman was watching videos of rehearsals for one of his television shows.

141.    As she bled from the anus.

142.    In yet another incident, Scarlett was bleeding and objecting after Gaiman forced himself on her.

143.    Gaiman told Scarlett that she needed to be punished.

144.    Gaiman then proceeded to punish her.

145.    By choking her with his belt.

146.    And by striking her with his belt.

147.    On her backside.

148.    And on her vagina.

149.    In another incident, Gaiman forced his penis inside Scarlett's mouth with such force that Scarlett vomited.

150.     Gaiman ordered Scarlett to clean up her own vomit.

151.     By licking it off his lap and off the couch.

152.     When Gaiman anally raped her that night he used butter, not truffle oil.

153.     And in another incident, he did it again.

154.     Some incidents took place in the presence of Gaiman and Palmer's child.

155.     On February 19, 2022, Gaiman and his child stayed in an Auckland hotel room.

156.     Scarlett came over to watch the child

157.     All three were present: Gaiman's child, playing with his iPad, Scarlett on the edge of the bed, Gaiman.

158.     Gaiman pulled Scarlett to him and covered them with bedding.

159.     Scarlett tried to get him to stop, mouthing "what the fuck are you doing?"

160.     Gaiman did not stop.

161.     Gaiman vaginally penetrated Scarlett from behind.

162.     While still talking to his child.

163.     While Scarlett buried her face in shame and pain.

164.     In an effort to avoid alerting the child.

165.     This continued for about five minutes.

166.     Gaiman then went to the bathroom.

167.     While in the bathroom, Gaiman covered his hand with urine.

168.     He returned to the bed.

169.     And wiped his hand on Scarlett's face and mouth, telling her that it was a "present" and ordering her to "lick it off."

170.     Gaiman returned to the bathroom.

171.    He ordered Scarlett to "finish [her] job."

172.    Scarlett entered the bathroom.

173.    Gaiman pushed Scarlett to her knees.

174.    Scarlett understood that Gaiman wanted her to perform oral sex on him.

175.    Gaiman put his penis in Scarlett's mouth.

176.    With the door open.

177.    Scarlett did not resist.

178.    Throughout this period, Scarlett was not paid.

179.    Gaiman and Palmer knowingly benefitted (financially and otherwise).

180.    Gaiman received free sexual services and labor from Scarlett.

181.    Palmer aided and abetted Gaiman's violations by providing knowing and substantial assistance to Gaiman when she knew or should have known that Scarlett was being subject to forced sexual acts through means of actual force or threats of force and that she and Gaiman were receiving free labor from her.

182.    Throughout this period, Gaiman ordered Scarlett to call him "master."

183.    Throughout this period, Gaiman would frequently refer to Scarlett as "slave."

184.    This happened so often that the child began to order Scarlett to call the child "master."

185.    The child began to call Scarlett "slave."

186.    Gaiman understood that Scarlett was not willingly participating in sexual activities with him.

187.    Gaiman understood that Scarlett did not consent to sexual activity.

188.    Gaiman did not mistakenly believe that Scarlett consented.

189.    Gaiman knew that he had previously gone beyond any consent provided by his many sexual partners.

190.    He knew this because prior partners had told him so.

191.    He also knew that his misconduct, breaches of trust, and nonconsensual sexual conduct caused his partners lasting harm.

192.    He knew this because prior partners had told him so.

193.    And he had responded by compensating them for the harm he caused.

194.    But only after they signed nondisclosure agreements to protect his reputation as a self-declared feminist.

195.    Gaiman showed no concern for Scarlett's state of mind or consent during the time Scarlett was kept as the child's nanny.

196.    Scarlett knew that she had only two choices: she could either submit to Gaiman's coercion and violence or she could try to escape.

197.    She had nowhere to go.

198.    She had no other residence.

199.    She had no other job.

200.    She had not been paid.

201.    She knew almost nobody on Waiheke but Gaiman and Palmer's friends.

202.    She was broke and homeless.

203.    Palmer and Gaiman knew that Scarlett was penniless and homeless.

204.    Scarlett could not afford housing.

205.    Scarlett could not easily afford transport off the island.

206.    Scarlett could not even easily afford food.

207.   Gaiman and Palmer did not forget to pay Scarlett.

208.   Gaiman and Palmer intentionally withheld Scarlett's pay.

209.   Gaiman and Palmer intended to have Scarlett trapped, vulnerable, and penniless.

210.   Because that would leave her without a real chance to defend herself or escape.

211.   It worked.

**E.    Gaiman And Palmer Discard Scarlett**

212.   Weeks after Scarlett began working as Gaiman and Palmer's nanny, Gaiman and the child left for Europe.

213.   Scarlett went to Palmer and told Palmer much of what Gaiman had been doing to her.

214.   Palmer expressed no surprise.

215.   Because Palmer was not surprised.

216.   Palmer said "I bet he did."

217.   Palmer told Scarlett – for the first time – more than a dozen women, including several former employees, had previously come to Palmer about abusive sexual encounters with Gaiman.

218.   Palmer told Scarlett some of those women had reported disturbing experiences.

219.   Palmer had told Scarlett none of this previously.

220.   Had Palmer told Scarlett this, Scarlett would not have accepted the job.

221.   Palmer said she would "take care" of Scarlett.

222.   And that she had done so before for other women.

223.   Taking care of Scarlett did not involve paying her.

224.   It did involve procuring temporary accommodation for Scarlett in Auckland.

225.   But this was not intended to help Scarlett escape.

14

226.    It was so that Scarlett would be available when Gaiman and the child returned to New Zealand.

227.    Or if they decided to ship Scarlett to the UK to be with Gaiman and the child.

228.    While living in temporary accommodation, Scarlett became suicidal.

229.    Scarlett told Palmer of her plan to commit suicide.

230.    Scarlett was put in a psychiatric respite center to treat her suicidal ideation.

231.    While Scarlett was hospitalized, Palmer's friends packed up Scarlett's possessions.

232.    When Scarlett returned to the temporary accommodation, she found her personal items packed up.

233.    She was told she could not stay.

234.    Now homeless, Scarlett found housing where she could, house-sitting for friends or crashing on their couches.

235.    Around this time, and while Scarlett was unhoused, Gaiman approached her and offered to pay her for the past work.

236.    Scarlett presented him with an invoice for her time, which he paid.

237.    Later, Gaiman offered to help Scarlett by paying a few months' rent.

238.    Before he would pay her the promised rent money, Gaiman required Scarlett to sign an employment agreement.

239.    This employment agreement was a sham.

240.    In part because it was backdated to the date Gaiman first assaulted her.

241.    After Scarlett signed the agreement, Gaiman paid her a small amount of "rent money" to "get her back on her feet".

242.    This payment was nowhere near the total amount that she was owed.

243.    Gaiman and Palmer's conduct left Scarlett feeling worthless and abandoned.

244.    Scarlett later filed a police report accusing Gaiman of sexual assault.

245.    She hoped and believed that Palmer would confirm her story.

246.    She hoped and believed this because of Palmer's carefully constructed reputation.

247.    And because Palmer had expressed disgust for what Gaiman had done, calling him "Weinstein" and predicting he would be inevitably "MeTooed".

248.    Her hope was in vain.

249.    The police took no action because Palmer refused to talk to them.

250.    Having taken labor, her sense of self-worth, and her optimism, Palmer and Gaiman abandoned Scarlett – leaving her alone, penniless, and struggling.

251.    Gaiman and Palmer caused Scarlett profound physical, mental, and emotional harm, and economic losses.

252.    She brings this action because she is entitled to be compensated for that harm.

253.    And because this must never happen again.

## FIRST CAUSE OF ACTION

(Human Trafficking in Violation of 18 U.S.C. §§1591, 1595(a))

254.    Scarlett repeats and realleges the facts set forth above as though more fully set forth herein.

255.    Scarlett brings this claim pursuant to 18 U.S.C. § 1595(a), which provides for civil remedies for violations of 18 U.S.C. § 1591, both individually against Defendants Palmer and Gaiman and for civil conspiracy.

256.    18 U.S.C. § 1591 prohibits individuals from "knowingly . . . recruit[ing], harbor[ing], transport[ing], provid[ing], obtain[ing] . . . or solicit[ing] by any means a person . . .

16

knowing, . . . or . . .in reckless disregard of the fact, that means of force, fraud, coercion . . . or any combination of such means will be used to cause the person to engage in a 'commercial sex act.'"

257.    A commercial sex act is "any sex act, on account of which anything of value is given to or received by any person." 18 U.S.C. § 1591(e)(3).

258.    Housing is "a thing of value".

259.    So is the promise of future career support.

260.    Defendant received free services from Scarlett.

261.    Defendant knowingly recruited, enticed, harbored, transported, and/or obtained Scarlett for labor or services while knowing she would be forced to engage in sexual acts as a condition of receiving the pay and housing they promised her.

262.    Defendant knowingly recruited, enticed, harbored, transported, and/or obtained Scarlett for labor or services with reckless disregard for the fact that she would be forced to engage in sexual acts as a condition of receiving the pay and housing they promised her

263.    Gaiman engaged in many nonconsensual sex acts with Scarlett.

264.    Those acts were abusive and demeaning.

265.    Defendant knew that a person of reasonable temperament would perceive the sex acts as abusive and demeaning.

266.    Scarlett endured those acts because she would lose her job, housing, and promised future career support if she did not.

267.    Sex acts performed in exchange for housing or wages are commercial sex acts.

268.    Defendant entered into an agreement with Scarlett for Scarlett to provide childcare services to Defendant, and Scarlett was then compelled to endure commercial sex acts to keep that job and the housing that came with it.

269.    Gaiman knew that Scarlett would be forced to endure commercial sex acts during her stay with him.

270.    Gaiman knew he had no intention of aiding Scarlett's career.

271.    Gaiman promised Scarlett he would do so to maintain access to her.

272.    Palmer recklessly disregarded the fact that Scarlett would be forced to endure commercial sex acts committed by Gaiman.

273.    Palmer knowingly approached and procured the services of Scarlett with reckless disregard for the fact that Gaiman would force Scarlett to engage in commercial sex acts with him.

274.    This constitutes an overt act in furtherance of Gaiman's agreed-upon violation of 18 U.S.C. § 1591.

275.    Gaiman knowingly forced Scarlett to engage in commercial sexual acts in violation of 18 U.S.C. § 1591 with Palmer's full knowledge and consent.

276.    This constitutes an overt act in furtherance of the Defendant and Gaiman's agreed-upon violation of 18 U.S.C. § 1591.

277.    Defendant received a financial benefit on account of the sexual exploitation they subjected Scarlett to, in the form of uncompensated childcare for their young son.

278.    Scarlett was forced to participate in these events because if she refused, she would have become homeless and would not have been compensated for her labor.

279.    Gaiman used fraud to subject Scarlett to commercial sex acts because he had no intention of providing career support.

280.    Upon information and belief, Palmer knew or should have known that Gaiman had promised future career support to his previous victims to make them submit to commercial sex acts.

281.    Upon information and belief, Palmer acted with reckless disregard for the fact that Gaiman would likely use the promise of future career support to subject Scarlett to commercial sex acts because Palmer knew he had done so in the past.

282.    As a direct and proximate result of the actions of the Defendant, Scarlett has suffered severe emotional distress, physical injuries, and economic losses. These injuries continue.

283.    Thus, Scarlett is entitled to damages in an amount to be determined at trial, but which is reasonably believed to be in excess of $1,000,000.00, including, without limitation, damages to physical well-being, emotional and psychological damages, past and future economic losses, past and future physical impairment damages including but not limited to PTSD, anxiety, and depression which are physical impairments of the brain, loss of career opportunities, together with punitive damages, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## **SECOND CAUSE OF ACTION**

(Human Trafficking in violation of 18 U.S.C. § 1589; Civil Conspiracy)

284.    Scarlett repeats and realleges the facts set forth above as though more fully set forth herein.

285.    Scarlett is authorized to bring this civil claim against Defendant pursuant to the civil remedies provision of § 1595(a) and for civil conspiracy to violate the same.

286.    Gaiman's conduct was intended to coerce sexual services and free childcare from Scarlett by causing her to believe that if she did not perform such labor and services, she would suffer serious harm or physical restraint.

287.    On information and belief, and in violation of §§ 1589 and 1595(a), Palmer knowingly benefitted from Gaiman's exploitation of Scarlett, knowing or in reckless disregard of the fact that Gaiman was obtaining Scarlett's sexual acts and childcare by means of a pattern of conduct intended to cause Scarlett to believe that if Scarlett did not perform such labor and services, Scarlett would suffer serious harm or physical restraint. On information and belief, Defendant Palmer knew or recklessly disregarded the reality that Gaiman would so coerce Scarlett.

288.    On information and belief, Defendant Palmer knew or recklessly disregarded the reality that Gaiman was obtaining Scarlett's forced sexual service during her three-week indenture.

289.    On information and belief, Defendant Palmer has downplayed or ignored other complaints of Gaiman's sexual assaults.

290.    As a direct and proximate result of the actions of Defendant, Scarlett has suffered severe emotional distress, physical injuries, and economic losses. These injuries continue.

291.    Thus, Scarlett is entitled to damages in an amount to be determined at trial, but which is reasonably believed to be in excess of $1,000,000.00, including, without limitation, damages to physical well-being, emotional and psychological damages, past and future economic losses, past and future physical impairment damages including but not limited to PTSD, anxiety, and depression which are physical impairments of the brain, loss of career opportunities,

together with punitive damages, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

### THIRD CAUSE OF ACTION

(Human Trafficking in violation of 18 U.S.C. § 1590(a), 1595(a); Civil Conspiracy)

292.    Scarlett repeats and realleges the facts set forth above as though more fully set forth herein.

293.    Scarlett is authorized to bring this civil claim against Defendant pursuant to the civil remedies provision of 18 U.S.C. § 1595(a).

294.    In violation of 18 U.S.C. § 1590(a), Defendant knowingly recruited, enticed, or obtained Scarlett for labor or services.

295.    Palmer knowingly recruited Scarlett to come to Waiheke with the intention of obtaining Scarlett's uncompensated labor.

296.    Palmer knowingly benefited from her recruitment and obtaining Scarlett, receiving free childcare/work/labor from Scarlett.

297.    Gaiman knowingly enticed Scarlett for her labor or services when he authorized Palmer to present her with the offer of a job as his and Palmer's live-in nanny.

298.    When Gaiman made this offer, he knew he planned to force Scarlett to engage in humiliating sexual conduct for his own gratification.

299.    Gaiman knowingly benefited from his enticement of Scarlett, receiving free sexual services and labor from Scarlett.

300.    As a direct and proximate result of the actions of the Defendant, Scarlett has suffered severe emotional distress, physical injuries, and economic losses. These injuries continue.

301.     Thus, Scarlett is entitled to damages in an amount to be determined at trial, but which is reasonably believed to be in excess of $1,000,000.00, including, without limitation, damages to physical well-being, emotional and psychological damages, past and future economic losses, past and future physical impairment damages including but not limited to PTSD, anxiety, and depression which are physical impairments of the brain, loss of career opportunities, together with punitive damages, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## FOURTH CAUSE OF ACTION

(Conspiracy to Commit Trafficking in violation of 18 U.S.C. § 1594, 1595(a))

302.     Scarlett repeats and realleges the facts set forth above as though more fully set forth herein.

303.     Scarlett is authorized to bring this civil claim against Defendant pursuant to the civil remedies provision of § 1595(a).

304.     18 U.S.C. § 1594 criminalizes any conspiracy to violate, among other provisions, 18 U.S.C. §§ 1591 and/or 1589.

305.     As alleged herein, Gaiman and Palmer conspired to violate 18 U.S.C. §§ 1591 and/or 1589 by agreeing or conspiring to obtain the forced sexual services of women, including Scarlett, in violation of 18 U.S.C. § 1589, and sex trafficking Scarlett in violation of 18 U.S.C. § 1591.

306.     On information and belief, Defendant came to an understanding and agreement to commit and/or cover up these violations through the course of their marriage, separation, and dealings with each other.

307.     As a direct and proximate result of the actions of Defendant, Scarlett has suffered severe emotional distress, physical injuries, and economic losses. These injuries continue.

22

308.    Scarlett is entitled to damages in an amount to be determined at trial, but which is reasonably believed to be in excess of $1,000,000.00, including, without limitation, damages to physical well-being, emotional and psychological damages, past and future economic losses, past and future physical impairment damages including but not limited to PTSD, anxiety, and depression which are physical impairments of the brain, loss of career opportunities, together with punitive damages, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## **FIFTH CAUSE OF ACTION**

### (Negligence, against Palmer)

309.    Scarlett repeats and realleges the facts set forth above as though more fully set forth herein.

310.    Scarlett repeats and realleges the facts set forth above as though more fully set forth herein.

311.    At the time that Palmer suggested to Scarlett that Scarlett babysit at Gaiman's home, Palmer knew that Gaiman was a sexual predator who enjoyed hurting women.

312.    Palmer had specific personal knowledge that Gaiman had sexually abused women in the past.

313.    Palmer had specific personal knowledge that Gaiman had raped women in the past.

314.    Palmer had specific personal knowledge that Gaiman's sexual predilections involved masochism.

315.    Palmer had specific personal knowledge that Gaiman's sexual predilections involved utter disregard for consent.

23

316.    Palmer knew Gaiman would likely target Scarlett for predation if she introduced Scarlett to Gaiman.

317.    Indeed, Palmer was sufficiently aware that Gaiman was likely to target Scarlett that she warned *Gaiman* to stay away from Scarlett before she brought Scarlett to Gaiman's house as a babysitter.

318.    And Palmer was specifically aware that Scarlett was in an extremely vulnerable psychological state, such that any abuse by Gaiman would severely harm Scarlett.

319.    Indeed, Palmer specifically warned Gaiman as much before bringing Scarlett to Gaiman's home.

320.    Yet Palmer never warned Scarlett of the known danger posed by Gaiman.

321.    Had Palmer warned Scarlett of the known danger posed by Gaiman, Scarlett would never have agreed to babysit Palmer's child at Gaiman's house.

322.    Indeed, upon information and belief, Palmer chose not to warn Scarlett of the danger posed by Gaiman because it would have been inconvenient for Palmer if Scarlett had declined to babysit her child at Gaiman's home.

323.    Scarlett's physical and emotional well-being was simply less important to Palmer than Palmer's convenience.

324.    Given her knowledge of Gaiman's predilections and predations, Palmer had a duty not to introduce further victims to him.

325.    Given her knowledge of Gaiman's predilections and predations, Palmer had a duty to warn Scarlett of the danger posed by Gaiman before introducing Scarlett to Gaiman.

326.    As a direct and proximate result of the actions of Palmer, Scarlett has suffered severe emotional distress, physical injuries, and economic losses. These injuries continue.

24

327.    By virtue of her negligence in introducing Scarlett to Gaiman and failing to warn Scarlett of the unreasonable danger Gaiman posed, Palmer is liable to Scarlett in an amount to be proven at trial, but which is reasonably believed to be in excess of $1,000,000.00

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Scarlett Pavlovich demands:

A.    Judgment against Defendant on all applicable claims, including damages to be proven at trial;

B.    Pre- and post-judgment interest on all damages awarded against Defendant

C.    Costs incurred in this suit as well as reasonable attorneys' fees; and

D.    Such other relief as the Court deems just and proper.

Dated: February 3, 2025

By: */s/Mitchell J. Matorin*
    Mitchell J. Matorin (BBO# 649304)
    MATORIN LAW OFFICE, LLC
    18 Grove Street, Suite 5
    Wellesley, MA 02482
    Tel: (781) 453-0100
    mmatorin@matorinlawoffice.com

    Thomas Neville (pro hac vice pending)
    Dylan Schmeyer (pro hac vice pending)
    Akiva M. Cohen (pro hac pending)
    KAMERMAN UNCYK SONIKER &
    KLEIN P.C.
    1700 Broadway
    New York, New York 10019
    Tel: (212) 400-4930
    tneville@kusklaw.com
    dschmeyer@kusklaw.com
    acohen@kusklaw.com

    Dan Lipman (pro hac vice pending)
    Lorraine Parker (pro hac vice pending)
    PARKER LIPMAN LLP
    3200 Cherry Creek South Drive
    Suite 520
    Denver, Colorado 80209
    Tel: (720)408-6840

    *Attorneys for Plaintiff*