IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

---

SCARLETT PAVLOVICH,
    *Plaintiff*,

    v.

AMANDA PALMER,
    *Defendant*.

No.  1:25-cv-10263-NMG

---

**DEFENDANT AMANDA PALMER'S MEMORANDUM IN SUPPORT OF
MOTION TO DISMISS PLAINTIFF SCARLETT PAVLOVICH'S COMPLAINT FOR
<u>FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED</u>**

Daniel N. Marx, Esq. (BBO#674523)
William W. Fick, Esq. (BBO #650562)
Amy Barsky, Esq. (BBO#601111)
FICK & MARX LLP
24 Federal Street, 4th Floor
Boston, MA 02110
(857) 321-8360
DMARX@FICKMARX.COM
WFICK@FICKMARX.COM
ABARSKY@FICKMARX.COM

Dated: April 21, 2025

# <u>TABLE OF CONTENTS</u>

Introduction ............................................................................................................... 1

Background ................................................................................................................ 2

Argument .................................................................................................................. 4

I.    Legal Standard ................................................................................................ 4

II.   The Complaint fails to state any plausible claim against Ms. Palmer for "sex trafficking" in violation of the TVPA (Count 1). .................................................................... 4

    A.    The Complaint fails to adequately allege the existence of any "venture." ............. 4

    B.    The Complaint fails to adequately allege Plaintiff was forced to engage in any "commercial sex act" with Gaiman. ..................................................................... 6

    C.    The Complaint fails to adequately allege Ms. Palmer "participated" in any sex-trafficking venture. ............................................................................................ 9

    D.    The Complaint fails to adequately allege Ms. Palmer "knowingly benefited" from any sex-trafficking venture. ............................................................................. 10

III.  The Complaint fails to state any plausible claim against Ms. Palmer for "forced labor" in violation of the TVPA (Count 2). .................................................................. 11

    A.    The Complaint fails to plausibly allege that Ms. Palmer used force, restraint, or threats to compel Plaintiff to provide childcare services. ..................................... 12

    B.    The Complaint fails to plausibly allege that Ms. Palmer prevented Plaintiff from leaving her job ............................................................................................... 13

    C.    The Complaint fails to plausibly allege Ms. Palmer used any threat of "serious harm" against Plaintiff to obtain her labor. ......................................................... 15

    D.    The Complaint fails to a plausibly allege that Ms. Palmer intended Plaintiff to believe that she would suffer serious harm if she quit her job ............................... 18

IV.   The Complaint fails to state any plausible claim against Ms. Palmer for "trafficking" in violation of the TVPA (Count 3). .................................................................. 18

V.    The Complaint fails to state any plausible claim against Ms. Palmer for "conspiracy" to violate the TVPA (Count 4). .......................................................................... 19

VI.   The Complaint fails to state any plausible negligence claim under Massachusetts law... 19

    A.    The Complaint fails to plausibly allege that Ms. Palmer owed Plaintiff any duty to protect Plaintiff from Gaiman. ......................................................................... 19

B.    Absent any viable federal claim, this Court should not exercise its supplemental jurisdiction over Plaintiff's state claim. ............................................................. 20

Conclusion ...................................................................................................................... 20

Certificate of Service ........................................................................................................ 21

## <u>INTRODUCTION</u>

Plaintiff Scarlett Pavlovich claims Neil Gaiman, who is not a party to this case, sexually assaulted her in New Zealand, where she briefly worked as a babysitter for Gaiman and Defendant Amanda Palmer in early 2022. To be clear, Plaintiff does *not* claim that Ms. Palmer committed or participated in any alleged assaults or that she was present when they supposedly occurred. In fact, according to the Complaint, the alleged assaults all occurred after Ms. Palmer separated from Gaiman and when they lived in separate homes.

The accusations that Ms. Palmer engaged in "sex trafficking" with Gaiman and obtained "forced labor" from Plaintiff are false and absurd. Plaintiff contends that, if a wife and mother hires an adult babysitter and later learns her husband had sex with the babysitter, with or without consent, the woman has violated the Trafficking Victims Protection Act ("TVPA") and is personally liable for money damages. That is not the law. If Plaintiff's allegations about Gaiman's assaults are true, Ms. Palmer was yet another victim of his deceit and manipulation.

Indeed, even accepting all her factual allegations as true, for the purpose of this motion, Plaintiff fails to state any claim under the TVPA against Ms. Palmer. The Complaint does not plausibly allege that Ms. Palmer (1) knowingly benefited from a venture that forced Plaintiff to engage in commercial sex (Count 1); (2) knowingly obtained forced labor from Plaintiff (Count 2); (3) trafficked her for those unlawful purposes (Count 3); or (4) conspired with Gaiman to do so (Count 4). Nor do does the Complaint plausibly allege that Ms. Palmer (5) negligently breached a common-law duty to protect Plaintiff from what she claims Gaiman did to her (Count 5).

Plaintiff has also sued Gaiman, and that case is pending in another court. *See Pavlovich v. Gaiman*, No. 3:25-cv-00078-jdp (W.D. Wis.), D.E. 1 (Complaint filed Feb. 3, 2025). Because the Complaint in this parallel case fails to state any viable claim *against Ms. Palmer*, who had nothing to do with the alleged sexual assaults by Gaiman, it should be dismissed with prejudice.

## BACKGROUND

In 2020, when Plaintiff was 22-years old, she met Ms. Palmer in Auckland, New Zealand, D.E. 1 at ¶¶ 19, 22. At the time, Ms. Palmer was married to, but separated from, Gaiman, with whom she shares a child. *Id.* ¶¶ 14, 16. They were "locked in a divorce and custody battle," and they lived in separate homes on Waiheke, a 40-minute ferry ride from Auckland. *Id.* ¶¶ 16, 23-24.

The Complaint asserts that, since at least 2015, Palmer had been "aware of Gaiman's pattern of sexual misconduct," *id.* ¶ 15, but it includes no factual allegations about any alleged "misconduct," the purported "pattern," or Ms. Palmer's knowledge.

When she met Ms. Palmer, Plaintiff was "economically insecure," *id.* ¶¶ 28, 30, and had "mental health difficulties," *id.* ¶¶ 31, 33. The Complaint asserts Ms. Palmer was "aware" of those personal circumstances. *Id.* ¶¶ 30, 34.

Then, in early 2022, Ms. Palmer asked Plaintiff to "babysit for the weekend," a job that "would entail spending time at both houses." *Id.* ¶¶ 36, 37, 39. Ms. Palmer "promised [Plaintiff] would be paid for this work," meaning babysitting, *id.* ¶ 40, and Plaintiff "agreed," *id.* ¶ 41.

A few days later, on February 4, 2022, Plaintiff arrived "at Gaiman's house" and "spent an hour with the child." *Id.* ¶¶ 42, 43. After Gaiman dropped the child at a friend's house, he returned, gave Plaintiff a tour, and had dinner with her. *Id.* ¶¶ 45, 47, 48. According to Plaintiff, while she was alone with Gaiman, they took a bath, and he raped her. *See id.* ¶¶ 51-84. At the time, Plaintiff did not tell Ms. Palmer about this alleged incident at Gaiman's house. *See id.* ¶¶ 212, 213.

"After the weekend," Ms. Palmer offered Plaintiff "a job as a live-in nanny." *Id.* ¶ 111. Plaintiff gave up her "prior job and housing," *id.* ¶ 116, and "accepted the [new] job," which "required her to care for the child at both Palmer's and Gaiman's houses." *Id.* ¶¶ 118, 119. Although the Complaint does not specify any employment terms, it suggests Plaintiff expected to receive pay and housing in exchange for childcare services.

2

According to Plaintiff, while she worked as a babysitter, "Gamain repeatedly raped [her]." *Id.* ¶ 124. Plaintiff does not allege Ms. Palmer participated in, was present during, or heard about the alleged incidents until later. *Id.* ¶¶ 212, 213. The Complaint says only that, after Gamain left New Zealand, Plaintiff told Ms. Palmer "much of what Gaiman had been doing to her." *Id.* ¶ 213.

Ms. Palmer supposedly "expressed no surprise," *id.* ¶ 214, telling Plaintiff other women, including Gaiman's "former employees," had reported "abusive sexual encounters." *Id.* ¶ 217. The Complaint does not identify the women or detail what they allegedly told Ms. Palmer. Nor does it identify any information that Ms. Palmer received about Gaiman abusing any babysitter.

Ms. Palmer helped Plaintiff find "temporary accommodations" in Auckland. *Id.* ¶ 224. After Plaintiff "became suicidal," she was treated at a "psychiatric respite center." *Id.* ¶¶ 228, 230. Plaintiff then moved to another house with friends. *See id.* ¶ 234.

At some point, when Plaintiff was no longer working as a babysitter and was living with friends, Gaiman offered to pay for her childcare services. *Id.* ¶ 235. Plaintiff gave Gaiman "an invoice for her time, which he paid." *Id.* ¶ 236. Gaiman also offered to help Plaintiff with her rent, and in exchange, he required her to sign an employment agreement that she contends was a "sham." *Id.* ¶¶ 237-41. The Complaint does not allege that Ms. Palmer knew anything about the agreement.

"Later," Plaintiff filed a police report in New Zealand, accusing Gaiman of rape. *Id.* ¶ 244. Plaintiff "hoped" Ms. Palmer would "confirm her story," even though Ms. Palmer had no direct knowledge of any misconduct by Gaiman toward Plaintiff. *Id.* ¶ 245. The police took no action against Gaiman, and Plaintiff blames Ms. Palmer for "refus[ing] to talk to them." *Id.* ¶ 249.

Plaintiff claims to have suffered "profound physical, mental, and emotional harm, and economic losses," but she fails to specify her alleged harms. Instead, she demands money damages from Ms. Palmer that she "believe[s] to be in excess of $1,000,000." *Id.* ¶¶ 283, 291, 301, 308.

## ARGUMENT

### I.     Legal Standard

To survive a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), a complaint must contain factual allegations sufficient "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim is facially plausible if, after accepting as true all non-conclusory factual allegations, the court can draw the reasonable inference that the defendant is liable for the misconduct alleged." *Willis v. Vericel*, 702 F. Supp. 3d 1, 3 (D. Mass. 2023).

### II.    The Complaint fails to state any plausible claim against Ms. Palmer for "sex trafficking" in violation of the TVPA (Count 1).

Plaintiff claims she was sexually assaulted by Gaiman—and only Gaiman. Plaintiff does *not* allege Ms. Palmer sexually assaulted her. Nor does Plaintiff allege Ms. Palmer participated in, was present during, or heard about Gaiman's alleged assaults until Plaintiff later reported some of them to Ms. Palmer. Instead, it appears Plaintiff claims that (i) by force, fraud, or coercion, Gaiman caused her to engage in commercial sex acts with him and (ii) Ms. Palmer knowingly benefited from his alleged conduct. But in seeking to impose "venture" liability on Ms. Palmer, the Complaint fails to allege she "knowingly . . . benefit[ed], financially or by receiving anything of value," from her "participation" in a "venture" that by "force, threats of force, fraud, or coercion," "caused" Plaintiff to engage in "commercial sex" with Gaiman. 18 U.S.C. § 1591(a)(2). Thus, Plaintiff's § 1595(a) claim, based on alleged § 1591(a) violations, should be dismissed.

#### A.     The Complaint fails to adequately allege the existence of any "venture."

The TVPA authorizes a civil claim against a defendant who knowingly benefits from participating in a "venture" that engages in sex trafficking. *See id.* § 1595(a); *see also* § 1591(a)(2). To state a claim for venture liability, a plaintiff must allege a "venture," which means "any group

of two or more individuals associated in fact, whether or not a legal entity." *Id.* § 1591(e)(6); *see Ricchio v. McLean*, 853 F.3d 553, 556 (1st Cir. 2017) (discussing "venture" element of TVPA claims). Whether a "venture" exists is "a legal conclusion that the Court need not accept as true, even at the motion to dismiss stage." *Doe v. Apple, Inc.*, No. 1:19-cv-03737 (CJN), 2021 U.S. Dist. LEXIS 237710, at *33 (D.D.C. Nov. 2, 2021) (dismissing § 1595(a) claims, where complaint failed to plausibly allege defendants formed "venture").

Although the First Circuit has not directly addressed the issue, most courts hold that, for TVPA claims, a "venture" must have a commercial aspect. *See Doe v. Red Roof Inns, Inc.*, 21 F.4th 714, 724-25 (11th Cir. 2021) (holding plaintiff must allege defendants "took part in a common undertaking or enterprise involving risk and potential profit"); *see also G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 554 (7th Cir. 2023) (holding "alleged venture can be a 'commercial venture' like running or expanding a business"). That understanding is consistent with *Ricchio v. McLean*, 853 F.3d 553 (1st Cir. 2017), in which the First Circuit held that hotel operators, a husband and his wife, actively participated in and financial benefited from a "venture" with a sex trafficker who used their rooms for the forced prostitution of his victim. *See id.* at 556.

In this case, however, the Complaint fails to plausibly allege any "venture." Instead, Plaintiff claims Gaiman—and Gaiman alone—sexually assaulted her. By definition, one person cannot form a "venture." *See* 18 U.S.C. § 1591(e)(6) ("any group of two or more persons"). Although one person, like Gaiman, could commit a sexual assault or engage in sex trafficking, such acts would not establish a business or commercial "venture." Absent factual allegations to establish a "venture," the Complaint fails to state a venture liability claim against Ms. Palmer.

The marriage between Ms. Palmer and Gaiman does not alter the analysis, because the TVPA does not impose liability "based upon a spousal or familial relationship." *Doe v. Gupta*, No.

3:22-cv-1122, 2023 U.S. Dist. LEXIS 57639, at *18 (N.D. Ohio Sept. 27, 2023). In *Gupta*, the plaintiffs claimed they were subjected to forced labor by a husband in violation § 1589(a), and they sought damages from his wife as a knowing beneficiary under § 1589(b), which uses the same "venture" language as § 1591(a)(2). The plaintiffs alleged the husband, a doctor with access to narcotics, had drugged and raped them. *See id.* at *3-4. They further alleged the wife received a letter from a victim but "failed to act" and "enabled" her husband's offenses. *Id.* at *4. In allowing the wife's motion to dismiss, the court ruled the plaintiffs failed to allege the wife "knowingly benefited" from her husband's actions or participated in a "venture" that violated the TPVA. *Id.*

Here, as in *Gupta*, the marriage, without more, cannot establish a "venture" between Ms. Palmer and Gaiman. *See id.* at *19 ("Plaintiff's allegations of liability based on the marriage relationship fall short of stating a plausible claim for relief."); *id.* at *20 ("Plaintiffs have not alleged [wife] had any participation in [husband]'s alleged venture other than that the two were married."). Rather, to impose venture liability, the Complaint must "plausibly allege [Ms. Palmer] knew she was receiving something of value from engaging in a business or commercial relationship" with Gaiman that involved sex-trafficking. *See id.* at *18. It makes no such allegation.

Moreover, even if a marriage might constitute a "venture" in other circumstances (*e.g.*, where husband and wife engage in a joint business enterprise), that was not the case for Ms. Palmer and Gaiman. The Complaint alleges that, before the alleged assaults by Gaiman, Ms. Palmer's marriage to him had ended, the couple had separated, and Ms. Palmer was living in a different house. *See* D.E. 1 at ¶¶ 16, 26, 27. Thus, the Complaint fails to allege that, at the relevant times, any "venture" between Ms. Palmer and Gaiman existed.

**B.**    **The Complaint fails to adequately allege Plaintiff was forced to engage in any "commercial sex act" with Gaiman.**

The TVPA prohibits, as "sex trafficking," forcing anyone to engage in a "commercial sex

act." 18 U.S.C. § 1591(a)(1). A "commercial sex act" is "any sex act, on account of which anything of value is given to or received by any person." *Id.* § 1591(e)(3). The phrase "on account of which" requires a "causal connection between the sexual act and the giving or receiving of anything of value." *United States v. Raniere*, 55 F.4th 354, 365 (2d Cir. 2022); *see United States v. Johnson*, No. 19-cr-405, 2024 U.S. Dist. LEXIS 172281, at *8-9 (N.D. Ill. Sept. 24, 2024) (interpreting "commercial sex act" in § 1591 to mean "transactional exchange of value for sex").

While all sexual assaults are "sex acts" that violate state criminal laws, *see, e.g.*, M.G.L. c.265, § 22 (rape) and § 13H (indecent assault and battery), only "commercial sex acts" fall within the limited scope of the TVPA, which focuses narrowly on "sex trafficking." The paradigmatic example is forced prostitution: a trafficker or pimp coerces a victim to have sex with clients for money. Here, the Complaint fails to adequately allege any "commercial sex act" between Plaintiff and Gaiman—that Plaintiff received money or anything of value "on account of" sex with him.

A court in this District dismissed similar TVPA claims for "sex trafficking" in *McLeod v. Fessenden School*, 624 F. Supp. 3d 36 (D. Mass. 2022) (Saylor, J.), because the complaint alleged rape and sexual assault, but not commercial sex. *See id.* at 43. Plaintiff, a student, alleged the defendant, a teacher, hired her to work as a "helper" at a summer program. *See id.* at 40. She further alleged that, during the program, the defendant sexually abused her. *See id.* The plaintiff asserted a TVPA claim under § 1595(a), alleging the defendant engaged in "sex trafficking" in violation of § 1591(a). *Id.* at 41. In allowing the defendant's motion to dismiss, the court ruled "the complaint fail[ed] to plead sufficient facts to infer that a 'commercial sex act' occurred—that is, that something of value was exchanged 'on account of' a sex act." *Id.* at 43. The facts that the defendant hired the plaintiff as a "helper" and gave her gifts did not transform his criminal sexual assaults into commercial sex trafficking. *See id.*

7

The same is true here. Like *McLeod*, this case is not one where Plaintiff was "enticed or forced . . . into prostitution." *Id.* Although Plaintiff claims Gaiman committed criminal sexual assaults, she has not plausibly alleged any "commercial sex acts," as the TPVA defines that term. The Complaint states only that Ms. Palmer offered to pay Plaintiff to work as a "babysit[ter]" and "live-in nanny," D.E. 1 at ¶¶ 36-41 (stating Palmer "promised [Plaintiff] would be paid for *this work*," meaning babysitting for the child) (emphasis added). The Complaint does *not* state Ms. Palmer paid money or gave anything of value to Plaintiff so that she would have sex with (or be raped by) Gaiman. Nor does it state that Gaiman paid Plaintiff to have sex with him.

Unable to make a good-faith allegation that she was paid to have sex with Gaiman, Plaintiff tries to mimic the "career advancement" claims that other women have successfully leveled against Harvey Weinstein.[1] The Complaint alleges that, before Plaintiff accepted the "nanny" job, "Gaiman promised [Plaintiff] he would use his tremendous industry influence to promote her writing career." *Id.* ¶ 116. But read in context, that lone allegation relates only to Plaintiff's babysitting job, not Gaiman's alleged assaults. *See id.* ¶ 116 ("Palmer encouraged [Plaintiff]" to accept job); *id.* ¶ 117 ("Gaiman promised [Plaintiff]" that he would help her career); *id.* ¶118 ("[Plaintiff] accepted the job."). Moreover, the allegation, which concerns Gaiman alone, fails to state a plausible claim against Ms. Palmer concerning "commercial sex." It offers no factual support for its conclusory allegations that Gaiman had "tremendous industry influence" or that

---

[1] In *Noble v. Weinstein*, 335 F. Supp. 3d 504 (S.D.N.Y. 2018), the court addressed the meaning of "commercial sex" in § 1591(a). As CEO of The Weinstein Companies ("TWC") and the most prolific producer in Hollywood, Weinstein could make or break careers. Gaiman is no Weinstein, and nothing in the Complaint suggests he wields similar "influence." Moreover, the women who sued Weinstein claimed that he exchanged (false) offers of career opportunities for sexual favors, not that he sexually assaulted them while they worked on TWC projects. Critically, in *Weinstein*, the court dismissed the claims against Weinstein's brother, Robert, who ran TWC with Harvey, finding "factual allegations" of his "participation" were "missing." *Id.* at 524.

Plaintiff had a "writing career." Nor does it allege Plaintiff had sex with Gaiman in exchange for his supposed promise. More importantly, it makes no allegation Ms. Palmer endorsed any promise, knew what Gaiman may have told Plaintiff, or was aware that they had sex with each other.

### C. The Complaint fails to adequately allege Ms. Palmer "participated" in any sex-trafficking venture.

The TVPA "targets those who participate in sex trafficking." *United States v. Afyare*, 632 Fed. Appx. 272, 286 (6th Cir. 2016). Because there can be no "guilt by association," a violation of § 1591(a)(1) requires "the defendant actually participated in a *sex-trafficking venture*." *Id.* "Participation" means "knowingly assisting, supporting, or facilitating" the venture. *Id.* § 1591(e)(4). "[M]ere membership in the venture is insufficient, if [the defendant] is ignorant of the venture's sex-trafficking activities[.]" *Afyare*, 632 Fed. Appx. at 285.

*Ricchio v. McLean*, 853 F.3d 553 (1st Cir. 2017), illustrates the sort of active, intentional conduct that constitutes "participation" for "venture" liability. Ricchio claimed the defendants, the Patels, a married couple, knowingly participated in a venture with a sex trafficker. *See id.* at 556. The Patels operated the Shangri-La Motel, where they also lived. *See id.* at 554. Their co-defendant, McLean, enticed Ricchio to the motel, where he took her captive, physically and sexually abused her, and forced her into prostitution. *See id.* at 555. Ricchio alleged that "McLean had prior commercial dealings with the Patels" and that all three wanted to "reinstate" their shared venture "for profit." *Id.* Although "McLean's coercive and abusive treatment of Ricchio as a sex slave had become apparent to the Patels," Mr. Patel "exchang[ed] high-fives" with McLean in the parking lot, and they talked about "getting this thing going again." *Id.* For her part, Ms. Patel "nonchalantly ignored Ricchio's plea for help in escaping from McLean's custody," visited his rented rooms to "demand further payment," and demonstrated "indifference to Ricchio's obvious deterioration." *Id.* Based on these factual allegations, the First Circuit held Ricchio adequately

stated claims that the Patels knowingly participated in a venture with McLean, by "renting space in which McLean obtained . . . . forced sexual labor or services from Ricchio." *Id.* at 556.

This case does not even remotely resemble *Ricchio*. The Complaint fails to state any plausible claim that Ms. Palmer participated in, encouraged, or observed Gaiman's alleged assaults, or his alleged use of force or fraud to coerce Plaintiff to engage in commercial sex with him. The Complaint says the opposite: it alleges when Ms. Palmer hired Plaintiff to babysit, she explicitly told Gaiman *not* to engage in any sexual activity with Plaintiff. *See* D.E. 1 at ¶ 87; *see also id* ¶¶ 85, 89. It does not allege Plaintiff told Ms. Palmer anything about the alleged assaults until after they supposedly occurred (and Gaiman left New Zealand). *See id.* ¶¶ 212-213.

### D. The Complaint fails to adequately allege Ms. Palmer "knowingly benefited" from any sex-trafficking venture.

Venture liability for sex trafficking depends on a defendant having "knowingly benefited" from participation in a venture that itself violated § 1591(a). *See* § 1595(a); *see also* § 1591(a)(2). Absent any knowing benefit, there is no statutory basis to impute civil liability from a primary perpetrator to a secondary defendant. Here, the Complaint fails to plausibly allege Ms. Palmer "knowingly benefit[ed]" from alleged sex trafficking of Plaintiff by Gaiman.

Any contrary contention would be completely incoherent. Ms. Palmer may have knowingly benefited from Plaintiff's work as a babysitter in exchange for an alleged promise of compensation and housing. But the Complaint fails to allege Ms. Palmer got anything of value on account of Plaintiff's allegedly having been sexually assaulted by Gaiman. To the contrary, those alleged incidents, if they occurred, could only have hurt Ms. Palmer, not benefited her in any way. Unlike the motel operators in *Ricchio*, Ms. Palmer was plainly not the "beneficiary" of "sex trafficking."

Put bluntly, if Gaiman sexually assaulted their babysitter, Ms. Palmer did not benefit, knowingly or otherwise, in any sense from his alleged acts, which Ms. Palmer had nothing to do

10

with and knew nothing about. By trying to contort the TVPA to authorize a "beneficiary" claim against Ms. Palmer for the alleged misdeeds of her estranged husband, Plaintiff makes a mockery of the moral and legal principles that animate the federal sex-trafficking law.

## III.    The Complaint fails to state any plausible claim against Ms. Palmer for "forced labor" in violation of the TVPA (Count 2).

The TVPA prohibits knowingly obtaining labor or services from another person by specific "means," including "force, threats of force, physical restraint, or threats of physical restraint"; "serious harm or threats of serious harm"; and "any scheme, plan, or pattern intended to cause the person to believe that, if the person did not perform such labor or services, that he person or another person would suffer serious harm or physical restraint." *Id.* §1589(a)(1), (2), (4); *see United States v. Bradley*, 390 F.3d 145, 150 (1st Cir. 2004). It defines "serious harm" to mean "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue to perform labor or services in order to avoid incurring that harm." 18 U.S.C. § 1589(c)(2).

In seeking to hold Ms. Palmer liable for "forced labor," Plaintiff fails to allege Ms. Palmer knowingly employed any prohibited "means" to obtain her services. 18 U.S.C. § 1589(a). The Complaint alleges that Plaintiff worked as a babysitter and that Ms. Palmer (and Gaiman) did not pay her, at least not on time or in full. But without factual allegations to support any plausible claim that Ms. Palmer used prohibited "means" to force Plaintiff to babysit, Plaintiff has nothing more than a basic employment or contract dispute—certainly not a federal "forced labor" case. Thus, Plaintiff's § 1595(a) claim, based on alleged § 1589(a) violations, should be dismissed.[2]

---

[2] If Plaintiff contends Ms. Palmer "knowingly benefited" from "participation in a venture" that obtained forced labor from Plaintiff, that claim for secondary liability under the TVPA fails

A.    **The Complaint fails to plausibly allege that Ms. Palmer used force, restraint, or threats to compel Plaintiff to provide childcare services.**

This case does not involve the "typical[] . . . forced labor situation[]," which features conditions akin to slavery, such as "squalid or otherwise intolerable living conditions, extreme isolation (from family and the outside world), threats of inflicting harm upon the victim or others (including threats of legal process such as arrest or deportation), and exploitation of the victim's lack of education and familiarity with the English language, all of which are 'used to prevent [vulnerable] victims from leaving and to keep them bound to their captors.'" *Muchira v. Al-Rawaf*, 850 F.3d 605, 618-19 (4th Cir. 2017) (quoting *United States v. Callahan*, 801 F.3d 606, 619 (6th Cir. 2015)); *see United States v. Toviave*, 761 F.3d 623, 630 (6th Cir. 2014) (vacating forced labor convictions) (noting in most cases, victims are "denied almost all contact with the outside world").

Plaintiff does not accuse Ms. Palmer of having used force, physical restraint, or threats to compel Plaintiff to provide childcare. The Complaint alleges that Ms. Palmer initially asked Plaintiff to babysit for a weekend, *see* D.E. 1 at ¶ 36; that Ms. Palmer promised to pay Plaintiff, *see id.* ¶ 40; that Plaintiff agreed, *see id.* ¶ 41; but that she was not paid until later, *see id.* ¶¶ 109, 110. It also alleges that, after the first weekend, Ms. Palmer offered Plaintiff a job as a "live-in nanny," *id.* ¶ 111; that Ms. Palmer and Gaiman promised to pay Plaintiff, *see id.* ¶ 120; that Plaintiff accepted the job, *see id.* ¶ 118; but that Ms. Palmer and Gaiman did not pay Plaintiff for her work, at least not until later, *see id.* ¶¶ 121, 178, 235, 236.

The allegations that Plaintiff provided childcare, but that Ms. Palmer (and Gaiman) did not pay her on time or in full, amounts to nothing more than an accusation that Ms. Palmer was a bad boss, who failed to promptly or fairly compensate Plaintiff. That claim does not establish a

---

for the same reason the parallel claim of sex trafficking fails. *See* Part I, *supra*.

violation of § 1598, because the TVPA distinguishes between "merely abusive employers" and ones who "deliberately s[eek] to compel forced labor" through prohibited "means." *Bradley*, 390 F.3d at 154. As courts have widely recognized, "not all bad employer-employee relationships or even bad employer-immigrant nanny relationships will constitute forced labor." *United States v. Dann*, 652 F.3d 1160, 1170 (9th Cir. 2011); *see Muchira*, 850 F.3d at 620 (affirming dismissal of § 1598 claims); *Tegete v. Maryknoll Sister of Saint Dominic, Inc.*, No. 20-cv-5023 (CS), 2023 U.S. Dist. LEXIS 43034, at *35 (S.D.N.Y. Mar. 14, 2023) (dismissing § 1598 claims).

Here, the Complaint fails to plausibly allege Ms. Palmer "knowingly or intentionally engaged in actions or made threats that were sufficiently serious to compel a reasonable person in [Plaintiff]'s position to *remain*" as a babysitter "against her will and in order to avoid such threats of harm, when she otherwise would have left." *Muchira*, 850 F.3d at 620. In muddling her allegations of sexual assault and forced labor, Plaintiff misconstrues § 1598; she does not claim to have been told, or reasonably made to believe, that if she did not work something bad would happen. *Compare United States v. Raniere*, No. 20-3530-cr (L); 20-3789-cr (Con), 2022 U.S. App. LEXIS 33949, at *6 (2d Cir. Dec. 9, 2022) (affirming § 1589 convictions where victim was forced to provide services to defendant and threatened that, if she refused, defendant would publicly disclose "sexually explicit videos" of victim, letters in which she falsely accused her father of sexual abuse, and credit card authorization forms). In this case, Plaintiff contends that she was sexually abused by Gaiman while she worked as a babysitter, not that she was sexually abused as a means to force her to work or to keep her from quitting.

### B.     The Complaint fails to plausibly allege that Ms. Palmer prevented Plaintiff from leaving her job.

When Congress enacted § 1589, the forced labor provision of the TVPA, it aimed to "combat trafficking in persons, a contemporary manifestation of slavery whose victims are

predominately women and children." Pub. L. 106-386, 114 Stat. 1466 (Oct. 28, 2000), codified at 22 U.S.C. § 7101(a); *see Dann*, 652 F.3d at 1169 ("In § 1598, Congress intended to reach cases in which persons are held in a condition of servitude through nonviolent coercion.").

Reflecting that congressional purpose, courts routinely reject forced labor claims by plaintiffs who may have suffered deplorable working conditions but could have simply quit their jobs or sought help. *See, e.g.*, *Taylor*, 110 F.4th at 1034 (defendant did not "attempt[] to prevent plaintiffs from leaving the program" and plaintiffs "could have left any time," if they objected to work or conditions); *Muchira*, 850 F.3d at 621 (plaintiff had "innumerable opportunities to walk out of [defendants'] home" and "virtually unfettered access to a private cell phone and to the Internet"); *Headley*, 687 F.3d at 1180 (plaintiffs had "access to vehicles, phones, and the Internet" and "innumerable opportunities to leave" the religious center where they worked); *Tegete*, 2023 U.S. Dist. LEXIS 43034, at *29 ("plaintiff's freedom of communication and movement belie[d] the notion that [she] felt so psychologically imprisoned that she was unable to terminate her employment and walk away"); *see generally Carmen v. Health Carousel, LLC*, No. 1:20-cv-313, 2021 U.S. Dist. LEXIS 113324, at *19 (S.D. Ohio June 17, 2021) ("As a general matter, 'involuntary servitude' refers to situations where an employee is not free to leave her employment."). Here, Plaintiff fails to explain how she was supposedly "forced," like a slave, to provide childcare services and why she could not have quit, left the family, and walked away.

The Complaint does not allege, for example, that Plaintiff was subjected to isolation or confinement in Ms. Palmer's (or Gaiman's) home. No physical, electronic, or language barriers restrained her or compelled her to continue babysitting. The Complaint alleges she traveled between the two homes, *see id.* ¶¶ 119, 213; left Waiheke, *id.* ¶¶ 155, 156; stayed at a hotel in Auckland, *id.*; and had friends and acquaintances in the area, including people who allowed her to

stay in their homes, *id.* ¶ 234. Plaintiff had "innumerable opportunities" to quit and leave. And eventually, she did. *See id.* ¶¶ 213, 214. Further undermining any claim against Ms. Palmer, the Complaint alleges that, when Plaintiff first told Ms. Palmer about the alleged assaults, Ms. Palmer did *not* force Plaintiff to continue working for the family. Just the opposite: Ms. Palmer helped Plaintiff to move out. *See id.* ¶¶ 222, 224 (alleging that after Plaintiff reported the supposed assaults by Gaiman, Ms. Palmer helped Plaintiff "procur[e] temporary accommodations . . . in Auckland").

Gaiman's alleged sexual abuse undermines Plaintiff's forced labor claim against Ms. Palmer, because his alleged abuse was the circumstance that caused Plaintiff "to *leave*" and "to stop providing labor," and it was plainly not the "means" by which Ms. Palmer hired Plaintiff or kept her on the job. *Headley*, 687 F.3d at 1180 (affirming dismissal of forced labor claims by plaintiffs who voluntarily accepted jobs at religious center but left due to oppressive conditions). "The text [of § 1589] requires that serious harm befall an employee 'if she did not continue to work' or a threat that 'compel[s] [her] to *remain* with the employer.'" *Id.* (quoting *Dann*, 652 F.3d at 1170). Here, the assaults allegedly occurred while Plaintiff worked as a babysitter but did not "cause[] [her] to continue [her] work and to remain" on the job. *Id.* at 1180.

## C.    The Complaint fails to plausibly allege Ms. Palmer used any threat of "serious harm" against Plaintiff to obtain her labor.

Plaintiff claims Ms. Palmer (and Gaiman) took advantage of her challenging personal situation—that Plaintiff faced financial and housing insecurity. *See* D.E. 1 at ¶¶ 28-31, 112-115. The Complaint alleges Plaintiff wanted a better job and more stable home, that Ms. Palmer (and Gaiman) offered her both, and that in doing so, they made her their "economic hostage." *Id.* at ¶ 122. That hyperbolic accusation does not plausibly state a "forced labor" claim. Hiring a needy person for a job that she voluntarily accepts does not violate the TVPA.

Although "[s]erious harm" under the TVPA can include "financial . . . harm," Plaintiff

misconstrues that statutory concept as a basis for civil liability. The fact that employees voluntarily accept jobs for money, shelter, food, or other necessities does not mean that employers have unlawfully obtained "forced labor." Defendants may be found liable under § 1589(a) "only if their threats and abusive conduct"—as opposed to other people's difficult life situations—"reasonably coerced or forced [the people] to provide labor." *Bradley*, 390 F.3d at 154.

For example, in *Doe v. Apple, Inc.*, No. 1:19-cv-03737 (CJN), 2021 U.S. Dist. LEXIS 237710 (D.D.C. Nov. 2, 2021), *aff'd*, 96 F.4th 403 (D.C. Cir. 2024), a case involving claims for child laborers who mined cobalt in the Congo, the court noted the allegations that "extreme poverty and threat of starvation made Plaintiffs desperate" to work but, nevertheless, held that "taking a job out of that desperation is not the same as being coerced through actual harm or the threats of harm." *Id.* at 37 (holding TVPA only "punishes bad actors who enslave or force the labor of others through threats, harm, or intimidation"). Similarly, in *Taylor v. Salvation Army National Corp.*, 110 F.4th 1017 (7th Cir. 2024), the plaintiffs, who suffered poverty, hunger, homelessness, and addiction, sued the Salvation Army for forcing them to work in rehabilitation programs. In affirming the dismissal of the TVPA claims, the Seventh Circuit identified "the principal 'serious harm' alleged in the Complaint" to be "the Salvation Army's discontinuation of food, clothing, and shelter allowances." *Id.* at 1031. In other words, if the plaintiffs chose not to work, they would lose those valuable benefits and be subject to desperate conditions. But that harsh consequence, the court held, did not constitute "serious harm." *Id.*

Here, Plaintiff alleges only that if she quit her babysitting job for Ms. Palmer and Gaiman, she could not expect that, going forward, they would continue to pay her or let her stay in their homes. She would have to find other work and another place to live. That does not state a plausible claim of "forced labor," because an employer does *not* violate the TVPA by "refusing to continue

paying employees who have quit" their jobs. *Carmen*, 2021 U.S. Dist. LEXIS 113324, at *19.

This case contrasts sharply with those in which allegations of "financial harm," or the threat of it, has been found to state plausible claims under the TPVA. As those other cases illustrate, "to constitute 'financial harm' under the TVPA, the threatened harm must be in some way improper or illicit," such as fraudulent "bait-and-switch situations" or unconscionable provisions in employment agreements. *Id.* at *29.

For example, in *United States v. Dann*, 652 F.3d 1160, 1162 (9th Cir. 2011), the defendant was convicted of obtaining forced labor from a woman from Peru. The defendant arranged for her victim's illegal entry into the United States, kept her passport, destroyed her return ticket, required her to work 14-hour days, confined her to the home, forbade her from speaking with others, limited her food, and withheld her pay. *See id.* at 1165-66, 1177. When the victim finally complained, the defendant claimed she owed $8,000, having incurred debts of $15,000 for travel and living expenses, of which only $7,000 had been worked off. *See id.* Similarly, in *Carmen v. Health Carousel, LLC*, No. 1:20-cv-313, 2021 U.S. Dist. LEXIS 113324 (S.D. Ohio. June 17, 2021), the plaintiffs were permitted to proceed with their TVPA claims, alleging the defendant used exploitative employment contracts to keep the plaintiffs, all women from the Philippines, on the job as nurses in the United States. *See id.* at *4-9. The court concluded that, in certain situations, "the financial consequences a contract imposes on leaving," through terminations fees, liquidated damages, or other penalties, "can be so egregious that they run afoul of the TVPA." *Id.* at *22.

Here, the Complaint make no allegations that Ms. Palmer "create[d] ever-evolving obligations in an effort to trap [Plaintiff] into providing additional services" as a babysitter. *Id.* at *19. Plaintiff stood to lose a future paycheck, but she was not told that she owed any debt or would have to pay any fees or damages. In short, as a financial matter, Plaintiff was free to go.

**D.     The Complaint fails to a plausibly allege that Ms. Palmer intended Plaintiff to believe that she would suffer serious harm if she quit her job.**

Even if the Complaint could be read to plausibly allege any threat of serious harm (it cannot), "[t]he linchpin of the serious harm analysis under § 1589 is not just that serious harm was threatened but that the employer intended the victim to believe that such harm would befall her." *Dann*, 652 F.3d at 1170. Here, no factual allegations support a reasonable inference that Ms. Palmer acted with the requisite *scienter* in employing Plaintiff as a babysitter.

**IV.     The Complaint fails to state any plausible claim against Ms. Palmer for "trafficking" in violation of the TVPA (Count 3).**

Because the Complaint fails to state any plausible claim that Ms. Palmer violated § 1589 or § 1591, the "trafficking" claim under § 1590 "must fail, too." *Doe v. Apple, Inc.*, 2021 U.S. Dist. LEXIS 237710, at *37-38 (dismissing § 1590 claims); *see also Edmonson v. Raniere*, 751 F. Supp. 3d 136, 78 (E.D.N.Y. 2024) (ruling that "when a human trafficking claim is predicated on a failed forced labor claim, the human trafficking claim will fail as well").

Section 1590, titled "Trafficking with respect to peonage, slavery, involuntary servitude, or forced labor," follows the preceding sections of the TVPA that bar peonage, involuntary servitude, and forced labor. *See* 18 U.S.C. §§ 1581, 1584, § 1589. In other words, § 1590(a) does not create an additional basis for potential civil liability for Ms. Palmer in this case, because the Complaint does not adequately allege Ms. Palmer "recruit[ed], harbor[ed], transport[ed], provid[ed], or obtain[ed]" Plaintiff as her "trafficker." *Id.* § 1590(a).

The Complaint does not plausibly claim Ms. Palmer "trafficked" Plaintiff to Gaiman with "knowledge" that he would force Plaintiff to engage in commercial sex or to provide forced labor. *See United States v. Maka*, 237 Fed. Appx. 225, 227 (9th Cir. 2007) (holding § 1590 requires knowledge that victim will be used by another person in violation of TVPA); *Joseph v. Signal Int'l*, No. 1:13-cv-324, 2015 U.S. Dist. LEXIS 33870, at *15 (E.D. Tex. Feb. 4, 2015) (same). Nor

18

does it claim Ms. Palmer "took some action that could amount to coercing" Plaintiff to engage in commercial sex or forced labor. *Lewis v. Monks of the Most Blessed Virgin Mary of Mt. Carmel*, 23-cv-202, 2025 U.S. Dist. LEXIS 123184, at \*17-18 (D. Wy. July 11, 2024).

To the extent the Complaint merely parrots some of the statute's words, *see* D.E. 1 at ¶ 294, "[t]hat is precisely the type of 'threadbare recital of [an] element[] of a cause of action, supported by mere conclusory statements,' that the Supreme Court has found insufficient to defeat a motion to dismiss." *Doe v. Apple, Inc.*, 2021 U.S. Dist. LEXIS 237710, at \*38 (quoting *Iqbal*, 556 U.S. at 678). Thus, Plaintiff's § 1595(a) claim, based on alleged § 1590(a) violations, should be dismissed.

## V.    The Complaint fails to state any plausible claim against Ms. Palmer for "conspiracy" to violate the TVPA (Count 4).

Plaintiff accuses Ms. Palmer of conspiring with Gaiman to obtain "forced labor" and engage in "sex trafficking." Again, because the Complaint fails to state plausible § 1589 or § 1591 claims, the § 1594 claim necessarily fails. Further, the conspiracy allegation is patently conclusory and, for that reason, legally insufficient. *See* D.E. 1 at ¶ 306. The Complaint states only: "Defendant [*sic*] came to an understanding and agreement to commit and/or cover up these allegations through the course of their marriage, separation, and dealings with each other." Putting aside that "marriage" is not a conspiracy, this lone allegation says nothing more than "Ms. Palmer conspired." Thus, the claim for conspiracy to violate the TVPA should be dismissed.

## VI.   The Complaint fails to state any plausible negligence claim under Massachusetts law.

### A.    The Complaint fails to plausibly allege that Ms. Palmer owed Plaintiff any duty to protect Plaintiff from Gaiman.

Under Massachusetts law, "[t]here can be negligence only where there is a duty to be careful, and whether there is a duty to be careful is a question of law." *Yakubowicz v. Paramount Pictures Corp.*, 404 Mass. 624, 629 (1989) (affirming summary judgment on negligence claims); *see Heath-Latson v. Styller*, 487 Mass. 581, 584 (2021) (affirming dismissal of negligence claims,

because "complaint does not allege facts that, if true, imposed a duty on the defendant to protect the decedent from harm caused by a third party"). Here, Plaintiff must establish Ms. Palmer had a legal duty to protect her from Gaiman's alleged assaults. *See Cumis Ins. Soc'y, Inc. v. BJ's Wholesale Club, Inc.*, 455 Mass. 458, 469 (2009) (affirming dismissal of negligence claims).

The Complaint fails to adequately plead Ms. Palmer owed a duty to protect Plaintiff from Gaiman. It baldly asserts, "[g]iven her knowledge of Gaiman's predilections and predations, Palmer had a duty to warn [Plaintiff] of the danger posed by Gaiman[.]" D.E. 1 at ¶ 325. But saying there is a "duty" does not create one. And Plaintiff's conclusory claim flouts the "general principle of tort law" that "[t]here is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another." *Lev v. Beverly Enters.*, 457 Mass. 234, 242 (2010); *see Kavanagh v. Trs. of Bos. Univ.*, 440 Mass. 195, 201 (2003). No case has held a wife and mother liable in similar circumstances, and creating a duty in this case would threaten limitless liability on all married people for the misconduct of their spouses.

**B.     Absent any viable federal claim, this Court should not exercise its supplemental jurisdiction over Plaintiff's state claim.**

When all federal claims are dismissed, "judicial economy, convenience, fairness, and comity . . . point toward declining to exercise jurisdiction" over remaining state claim. *Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 350 n.7 (1988). That is especially true when the state claim involves a novel theory or difficult issue. *See Houlton Citizens' Coal. v. Town of Houlton*, 175 F.3d 178, 192 (1st Cir. 1999). Thus, if this Court dismisses Plaintiff's federal claims but not her state claim, it should decline to exercise supplemental jurisdiction over that novel claim, which seeks to hold a wife liable because her estranged husband allegedly had sex with their babysitter.

## CONCLUSION

For the foregoing reasons, this Court should dismiss the entire Complaint with prejudice.

Respectfully submitted,

**AMANDA PALMER**

By her attorneys,

*/s/ Daniel N. Marx*
Daniel N. Marx, Esq. (BBO#674523)
William W. Fick, Esq. (BBO#650562)
Amy Barsky, Esq. (BBO#601111)
FICK & MARX LLP
24 Federal Street, 4th Floor
Boston, MA 02110
(857) 321-8360
DMARX@FICKMARX.COM
WFICK@FICKMARX.COM
ABARSKY@FICKMARX.COM

Dated: April 21, 2025

## CERTIFICATE OF SERVICE

I certify that this document and any attachments filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on April 21, 2025.

*/s/ Daniel N. Marx*
Daniel N. Marx

21