IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

SCARLETT PAVLOVICH,

        Plaintiff,

-against-

AMANDA PALMER,

        Defendant.

C.A. NO. 1:25-CV-10263F

---

**PLAINTIFF SCARLETT PAVLOVICH'S MEMORANDUM IN OPPOSITION TO DEFENDANT AMANDA PALMER'S MOTION TO DISMISS COUNTS 1 THROUGH 4 OF PLAINTIFF'S COMPLAINT**

---

Mitchell J. Matorin (BBO# 649304)
MATORIN LAW OFFICE, LLC
18 Grove Street, Suite 5
Wellesley, MA 02482
Telephone: (781) 453-0100
E-mail: mmatorin@matorinlawoffice.com

Thomas Neville (*Pro Hac Vice*)
Dylan Schmeyer (*Pro Hac Vice*)
Akiva M. Cohen (*Pro Hac Vice*)
KAMERMAN UNCYK SONIKER &
    KLEIN P.C.
1700 Broadway
New York, New York 10019
Telephone: (212) 400-4930

Michael Nimmo (*Pro Hac Vice*)
WAHLBERG, WOODRUFF, NIMMO &
    SLOANE, LLP
4601 DTC Boulevard, Suite 950
Denver, CO 80237
Telephone: (303) 571-5302

*Counsel for Plaintiff*

## Table of Contents

FACTUAL BACKGROUND ................................................................................................... 4

ARGUMENT ..................................................................................................................... 6

    I.    The Statutory Language of the TVPA Is Clear That It Applies to Palmer's Conduct......... 6

    II.   Congress specifically intended for the TVPA civil remedies provision to reach the alleged foreign conduct pleaded herein. ............................................................................ 7

        A.   Courts have routinely held that the civil provision of the TVPA allows for recovery for claims arising from alleged foreign conduct. ......................................................... 9

        B.   Palmer's Reliance on *RJR Nabisco* Is Misplaced........................................................11

CONCLUSION.................................................................................................................. 12

## Table of Authorities

Page(s)

**Cases**

*Abernathy v. Carlyle Grp., Inc.*, , 2024 WL 5331993 (D.D.C. Sept. 27, 2024)....................9, 10, 11

*Adhikari v. Daoud & Partners (Adikhari I)*, 994 F. Supp. 2d 831 (S.D. Tex. 2014) ...................... 9

*Adhikari v. KBR Inc. (Adikhari II)*, 2017 WL 4237923 (S.D. Tex. Sept. 25, 2017) ....................... 9

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).................................................................... 6

*Dandong Old North-East Agric. & Animal Husbandry Co. v. Hu*,
  2017 U.S. Dist. LEXIS 122471 (S.D.N.Y. Aug. 3, 2017)......................................................... 12

*Doe I v. Apple Inc.,* 2021 WL 5774224 (D.D.C. Nov. 2, 2021)..................................................... 10

*Ratha v. Rubicon Res., LLC*, 111 F.4th 946 (9th Cir. 2024)............................................................ 9

*RJR Nabisco v. Eur. Cmty.*, 579 U.S. 325 (2016) ............................................................... 6, 8, 12

*Roe v. Howard*, 917 F.3d 229 (4th Cir. 2019) ........................................................................... 7, 8

*U.S. ex rel. Fadlalla v. DynCorp Int'l LLC*, 402 F. Supp. 3d 162, (D. Md. 2019) ......................... 9

*U.S. ex rel. Hawkins v. ManTech Int'l Corp.*, 2024 WL 4332117 (D.D.C. Sept. 27, 2024) ....10, 11

**Statutes**

18 U.S.C. § 1595..................................................................................................................6, 11, 12

18 U.S.C. § 1694(c) ...................................................................................................................... 12

Plaintiff respectfully requests that the Court deny Defendant Amanda Palmer's Motion to Dismiss Counts 1 through 4 of Plaintiff's Complaint Because the Trafficking Victims Protection Act Does Not Apply Extraterritorially to the Alleged Conduct in New Zealand (the "Motion").

## **FACTUAL BACKGROUND**

At 22 years old Scarlett Pavlovich was sexually assaulted by Neil Gaiman multiple times while she was living in New Zealand. *See* Dkt. 1 at ¶8-253. Gaiman brutalized, humiliated, and forced Scarlett to engage in appalling sexual acts while she provided free childcare and labor for Gaiman and Palmer's child. *Id*. Gaiman has a decades-long history of sexual misconduct in which he had forced several other women to engage in similar nonconsensual sexual acts to such an extent that he has settled many such claims, typically with settlement agreements with strict confidentiality provisions. *Id.* at ¶¶ 10, 107.  Since at least 2015, Palmer has been aware of Gaiman's pattern of sexual misconduct and abuse. *Id.* at ¶ 15.

Scarlett and Palmer met in Auckland, New Zealand, in 2020. *Id.* at ¶ 18. Scarlett, at the time, was economically insecure and unhoused. *Id.* at ¶28-29. In addition, Scarlett had struggled with substantial mental health difficulties over the years; including significant bouts of anxiety related to her insecure housing status. *Id.* at ¶26-35. Scarlett had discussed both her mental health difficulties and her economic status with Palmer on numerous occasions. *Id.* at ¶30-35. Palmer, armed with this knowledge, sought to recruit and entice Scarlett into giving Palmer free labor and services all whilst knowing or recklessly disregarding that fact that Gaiman would target Scarlett as he had so many women before. *Id.* at ¶86-99.

In February of 2022, Palmer asked Scarlett to babysit her child for the weekend at her home on Waiheke Island. *Id.* at ¶36. Waiheke Island is located 40-minutes by ferry off the coast of Auckland, New Zealand. *Id.* at ¶23-25.  Palmer promised payment for Scarlett's services and

requested that Scarlett spend time at both her home and Gaiman's home on the island. *Id.* at ¶ 39-42. On February 4, 2022, Scarlett arrived at Gaiman's house to babysit for Gaiman and Palmer's child. *Id.* at ¶ 42. Unbeknownst to Scarlett, Palmer had purchased tickets to a film event and suggested that Scarlett attend the event with Gaiman after dropping the child off at a family friend's house for a playdate. *Id.* at ¶46. Gaiman used this opportunity to force Scarlett to engage in unwanted and nonconsensual sexual acts. *Id.* at ¶ 47-86. Gaiman insisted, despite Scarlett's unwillingness, that Scarlett bathe in an outdoor bathtub at his home. *Id.* at ¶ 51-54. There, Gaiman forcibly penetrated and raped Scarlett. *Id.* at ¶56-84.

Palmer knew Gaiman had an extensive history of sexual misconduct and knew that Gaiman had a need to humiliate his female sexual partners. *Id.* at ¶ 90-97. Palmer knew or should have known that Gaiman would engage in non-consensual sexual acts with Ms. Pavlovich. *Id.* at ¶ 97-99. Gaiman told Scarlett that Palmer "told me that I couldn't have you" and that Gaiman couldn't have "this one." *Id.* at ¶ 85-97. Palmer either knew or should have known that telling Gaiman that he "couldn't have" Scarlett would fuel his desire to sexually assault Scarlett. *Id.* at ¶ 97-99. Palmer never disclosed any of Gaiman's history of prior sexual misconduct or the danger that Gaiman posed to Scarlett prior to engaging Scarlett to work for Palmer and Gaiman. *Id*. at ¶94-96.

After the weekend of February 4, 2022, Palmer formally offered Scarlett a job as a live-in nanny. *Id.* at ¶ 111-118. Although Palmer made promises to pay Scarlett for her services, Palmer did not pay Scarlett. *Id.* at ¶121. In essence, Palmer and Gaiman kept Scarlett as an economic hostage knowing that Scarlett was economically insecure. *Id.* at ¶122. During her time as a live-in nanny, Gaiman repeatedly sexually assaulted Scarlett. *Id.* at ¶ 123. Palmer aided and abetted Gaiman's sexual assault by providing assistance to Gaiman when she knew or should have known Gaiman was subjecting Scarlett to nonconsensual sex acts. *Id.* at ¶ 181. Palmer intentionally

withheld payment from Scarlett in order to force Scarlett to become reliant on Palmer and Gaiman and to keep Scarlett from escaping. *Id.* at ¶207-210. Palmer and Gaiman intended to have Scarlett trapped, vulnerable, and penniless because it would leave Scarlett without a real chance to defend herself or escape. *Id.*

## INTRODUCTION

On a motion to dismiss for failure to state a claim, the well-pled allegations of the Complaint must be assumed to be true and all reasonable inferences drawn in favor of the Plaintiff. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Palmer moves to dismiss Counts 1-4 of Scarlett's Complaint and argues that under the legal framework, Congress' intent, and the language of TVPA itself, Congress only provided victims of human trafficking by U.S. residents with a right to civil recovery for the harm caused by their abusers if the criminal conduct occurred in the United States. Palmer's arguments fail because she misinterprets the clear language of the TVPA and Congress' intent, and misplaces her reliance on *RJR Nabisco v. Eur. Cmty.*, 579 U.S. 325 (2016), a case interpreting the extraterritorial application of the RICO statute.

## ARGUMENT

**I.   The Statutory Language of the TVPA Is Clear That It Applies to Palmer's Conduct.**

Section 1595 of the TVPA provides a right to maintain a civil action in U.S. district courts to any "individual who is a victim of a violation of this chapter." 18 U.S.C. § 1595. And Section 1596 of the TVPA, adopted after Congress had extended a private right of action to victims of violations of Chapter 77 of Title 18, extended the statute's reach to cover purely extraterritorial conduct "under section 1581, 1583, 1584, 1589, 1590, or 1591," so long as the offender is either a U.S. National or an alien lawfully admitted for permanent residence or so long as the alleged offender is present within the United States. *Id.*, § 1596. As such, Palmer's alleged conduct is "a violation" of Chapter 77, and Scarlett is "an individual who is a victim of" such a violation. Since

Palmer is a U.S. National, Scarlett is therefore entitled to sue in any appropriate U.S. district court. And this Court is appropriate because Palmer resides in this district.

## II. Congress specifically intended for the TVPA civil remedies provision to reach the alleged foreign conduct pleaded herein.

In her attempts to distort the purpose of the TVPA, Palmer argues that Congress did not intend for the civil remedies provision to apply to foreign conduct. Under Palmer's incorrect interpretation, Congress only intended to provide victims of human trafficking by United States residents with a right to civil recovery for the harm caused by their abusers if the criminal conduct occurred in the United States. Multiple courts have found that this is simply not so.

The only appellate decision directly on point is the Fourth Circuit's decision in *Roe v. Howard*, 917 F.3d 229 (4th Cir. 2019). Howard is, fortunately, particularly instructive, not least for the factual overlap in the claims. *Howard*, supra, 917 F.3d at 229. Like Defendant Palmer, the bad actors in Howard were American residents living overseas – an American diplomat, Linda Howard, and her husband, Russell, who were living in Sana'a, Yemen while Russell sexually abused a domestic employee Linda had procured for him. *Id.* at 233, 234-235. After a jury in the Eastern District of Virginia found Linda (and her husband's estate) liable to the employee under the TVPA and awarded her victim $3,000,000.00, Linda moved for a judgment as a matter of law on the basis that the TVPA's civil provisions did not apply extraterritorially. *Id.* at 233. When that motion was denied, Linda appealed. *Id.*

The Fourth Circuit thoroughly explained that Linda was wrong. It observed that Congress enacted the TVPA in 2000 to combat transnational human trafficking and sexual exploitation, creating "several new federal criminal offenses intended to more comprehensively and effectively" address the problem, including 18 U.S.C. 1589, 1590, and 1591. *Howard*, 917 F.3d at 236. In 2003, Congress amended the statute to provide a civil remedy for violations of the TVPA, allowing "an

individual who is a victim of a violation [to] bring a civil action against the perpetrator … in an appropriate district court of the United States." *Id.* (quoting 18 U.S.C. §1595(a), alteration altered). In 2006, Congress expanded the TVPA's extraterritorial reach to conduct by government employees and contractors outside the United States, expanding the conduct that would be a "violation" allowing a victim to "bring a civil action against the perpetrator" in U.S. courts. *Id.* at 236-37. And in 2008, Congress further expanded its reach to cover any violation of Sections 1589-1591 anywhere in the world. *Id.* at 237. Applying the framework for assessing extraterritoriality supplied in *RJR Nabisco v. Eur. Cmty.*, 579 U.S. 325 (2016), the Fourth Circuit had little difficulty concluding that Congress intended the TVPA to apply extraterritorially and therefore displaced any contrary presumption that might otherwise limit 18 U.S.C. § 1595. *Howard*, 917 F.3d at 241:

> "Of crucial importance, § 1595 directly incorporates predicate offenses that govern foreign conduct, providing strong textual evidence of its extraterritorial effect when applied to those predicates. … Additionally, the purpose, structure, history, and context of the TVPRA militate toward the extraterritorial application of § 1595, to the extent that the relevant predicate offenses reach the challenged foreign conduct at issue."

*Id*.

Thus, the Court was satisfied that "§ 1595 reflects congressional intent that it applies extraterritorially to the extent that a plaintiff seeks redress for a predicate offense that is itself extraterritorial." *Id.* at 242. More, "the purpose, structure, history, and context of the TVPA" all supported construing Section 1595 as applying extraterritorially (as to any offenses that themselves apply extraterritorially), because the TVPA pervasively references international issues and Congress enacted it as a "far-reaching congressional effort to combat transnational human trafficking on numerous fronts, including by expanding the civil claims and remedies available to its victims." *Id.* Because Congress was "clearly concerned with international rather than purely domestic matters… unduly limiting the TVPA's scope risks frustrating its animating purpose." *Id.*

**III.     Courts have routinely held that the civil provision of the TVPA allows for recovery for claims arising from alleged foreign conduct.**

Numerous other courts have reached the same conclusion. The Ninth Circuit recently devoted an opinion to determining whether the 2008 amendments were retroactive, allowing civil claims for extraterritorial violations that occurred before 2008, or only allowed civil claims for extraterritorial violations occurring after 2008; there was no dispute that the civil remedy provision applied extraterritorially to violations occurring after 2008. *Ratha v. Rubicon Res., LLC*, 111 F.4th 946, 953 (9th Cir. 2024) (concluding that the provision was not retroactive), *reh'g en banc granted, opinion vacated*, No. 23-55299, 2025 WL 689487 (9th Cir. Mar. 4, 2025). *See also Adhikari v. KBR Inc. (Adikhari II)*, No. 4:16-CV-2478, 2017 WL 4237923, at *5 (S.D. Tex. Sept. 25, 2017) (the 2008 amendments allow for such claims only based on post-2008 conduct); *Adhikari v. Daoud & Partners (Adikhari I)*, 994 F. Supp. 2d 831, 840 (S.D. Tex. 2014) (concluding that the 2008 amendments created civil liability for extraterritorial conduct only on a going-forward basis), *aff'd sub nom. Adhikari v. Kellogg Brown & Root, Inc.*, 845 F.3d 184, 200 (5th Cir. 2017); In *U.S. ex rel. Fadlalla v. DynCorp Int'l LLC*, 402 F. Supp. 3d 162, 198 (D. Md. 2019), the District of Maryland allowed a civil claim brought pursuant to Section 1595 of the TVPA to proceed where it was based on conduct occurring in Kuwait. *Id.* at 197-199. In *Abernathy v. Carlyle Grp., Inc.*, No. CV 22-3603 (ABJ), 2024 WL 5331993, at *14 (D.D.C. Sept. 27, 2024), the District of Columbia held that the TVPA's civil remedies provision "applies extraterritorially to the extent that the offenses for which it supplies a private right of action have extraterritorial application." *Id.* at *13. And it did the same in *U.S. ex rel. Hawkins v. ManTech Int'l Corp.*, No. CV 15-2105 (ABJ), 2024 WL 4332117 (D.D.C. Sept. 27, 2024). (a companion case to *Abernathy* on the same facts, decided together by Judge Berman Jackson). Those conclusions are, effectively, directly compelled by the text of 18 U.S.C. §§ 1595 and 1596.

9

Defendant Palmer relies heavily on a decision in the District of Columbia, *Doe I v. Apple Inc.,* No. 1:19-CV-03737 (CJN), 2021 WL 5774224 (D.D.C. Nov. 2, 2021)*, aff'd sub nom. Doe 1 v. Apple Inc.,* 96 F.4th 403 (D.C. Cir. 2024), which is not only an outlier, but has been specifically rejected within that same District. In *Doe I*, Judge Nichols first ruled that the case had to be dismissed because the plaintiffs lacked standing. 2021 WL 5774224, *6-8 ("The injuries Plaintiffs suffered are horrifying. But it takes many analytical leaps to say that the end-purchasers of a fungible metal are responsible for the conditions in which that metal might or might not have been mined"). He then ruled that the court lacked personal jurisdiction over Dell. *Id.*, *9-10. Having already ruled that the claims were subject to dismissal, Judge Nichols then found that the plaintiffs had failed to substantively allege any violation of the TVPA, for multiple reasons. *Id.*, *10-14 (finding that plaintiffs failed to sufficiently allege "participation in a venture" under § 1595 or any underlying violation of sections 1589 or 1590).

Only after dismissing the claims for each of those reasons did Judge Nichols turn to extraterritoriality. On that topic, Judge Nichols noted that Section 1595's text did not expressly include extraterritorial application and found it significant that the list of provisions in Section 1596 for which Congress specified operated extraterritorially did not include Section 1595. *Id.* at 14-16. Because it "seem[ed] likely" that Section 1595's omission from 1596 "was not mistaken," Judge Nichols concluded that reflected "an intentional decision not to extend extraterritorially the reach of the statute's civil component." *Id.* at 16. On appeal, the D.C. Circuit reversed as to standing but affirmed as to the failure to allege the defendants' "participation in a venture," and therefore affirmed the dismissal. *Doe 1*, 96 F.4th at 406. It did not reach Judge Nichols' alternative conclusions about extraterritoriality.

In both *Abernathy* and *Hawkins*, however, Judge Berman Jackson considered and not only rejected but refuted Judge Nichols' analysis:

> The Court is not persuaded by this analysis. First, it fails to take into account the order in which the various provisions were enacted. When the statute was first passed in 2000, it included some extraterritorial offenses. It was after that, in 2003, that Congress announced that a victim could bring a civil action for violation, and it added more extraterritorial provisions. And it was only after that, in 2008, that Congress expressed is [*sic*] intention in section 1596(a) that other offenses should also have extraterritorial reach. So it would be inappropriate to predicate a narrowing construction of the civil provision on a later, unrelated amendment to the statute. Second, the *Doe* opinion finds meaning in the fact that the civil remedy provision, section 1595, was not listed in 2008 when Congress identified additional provisions that could be applied abroad. … But that would not have made sense. Section1956(a)[*sic*] listed "offenses" over which courts would have extraterritorial jurisdiction, and section 1595 is not an "offense" – it is a free-standing provision that creates a civil remedy for an "offense," that is, any "violation of this chapter." 18 U.S.C. § 1595(a).
>
> The Court finds the Fourth Circuit decision in *Roe v. Howard*, 917 F.3d 229 (2019), to be more in line with the text of the TVPRA.

*U.S. ex rel. Hawkins v. ManTech Int'l Corp.*, 752 F. Supp. 3d 118, 133 (D.D.C. 2024); *see also Abernathy v. Carlyle Grp., Inc.,* 2024 WL 5331993, at *12 (D.D.C. Sept. 27, 2024).

Judge Berman Jackson was correct, and the view set forth in *Doe I* was and is wrong. Indeed, Section 1595 does not operate extraterritorially at all. Section 1595 operates entirely within the United States, by opening U.S. courts to victims of TVPA violations. 18 U.S.C. § 1595. The sole predicate required for such access is that the plaintiff be a "victim of a violation of [Chapter 77]." *Id.*

### IV.  Palmer's Reliance on *RJR Nabisco* Is Misplaced.

While Defendant Palmer cites *Dandong Old North-East Agric. & Animal Husbandry Co. v. Hu*, No. 15-cv-10015 (KPF), 2017 U.S. Dist. LEXIS 122471, *36-37 (S.D.N.Y. Aug. 3, 2017) to analogize the TVPA civil remedies provision to the civil remedies provision of RICO, that analogy does not hold; RICO's civil remedies provision incorporated a substantive element beyond

11

mere victimization: the Plaintiff had to also have been "injured in his business or property by reason of the violation." 18 U.S.C. § 1694(c). The question of what injury was sufficient thus required an independent extraterritoriality analysis: "by cabining RICO's private cause of action to particular kinds of injury—excluding, for example, personal injuries—Congress signaled that the civil remedy is not coextensive with § 1962's substantive prohibitions." *RJR Nabisco v. Eur. Cmty.*, 579 U.S. 325, 350 (2016).

The TVPA, in contrast, opens the courts to any victim of a violation, a class expressly coextensive with Chapter 77's substantive provisions. 18 U.S.C. § 1595(a). The TVPA thus plainly allows foreign plaintiffs such as Scarlett to seek redress in U.S. courts for foreign human trafficking by U.S. citizens and permanent residents. Since it is clear that the TVPA civil remedies provision applies to the case herein, Defendant Palmer's Motion fails.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motion.

DATED: June 4, 2025

                Respectfully submitted,

                 */s/ Mitchell J. Matorin*

                Mitchell J. Matorin (BBO# 649304)
                MATORIN LAW OFFICE, LLC
                18 Grove Street, Suite 5
                Wellesley, MA 02482
                Telephone: (781) 453-0100
                E-mail: mmatorin@matorinlawoffice.com

                Thomas Neville (Pro Hac Vice)
                Dylan Schmeyer (Pro Hac Vice)
                Akiva M. Cohen (Pro Hac Vice)
                KAMERMAN UNCYK SONIKER & KLEIN P.C.
                1700 Broadway
                New York, New York 10019

Telephone: (212) 400-4930  
E-mail: tneville@kusklaw.com  
E-mail: dschmeyer@kusklaw.com  
E-mail: acohen@kusklaw.com  

Michael Nimmo (Pro Hac Vice)  
WAHLBERG, WOODRUFF, NIMMO & SLOANE, LLP  
4601 DTC Boulevard, Suite 950  
Denver, CO 80237  
Telephone: (303) 571-5302  
E-mail: michael@denvertriallawyers.com  
*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on June 4, 2025, a true and correct copy of the foregoing Plaintiff Scarlett Pavlovich's Response to Defendant Amanda Palmer's Motion to Dismiss Counts 1 Through 4 of Plaintiff's Complaint was filed through the CM/ECF portal, which will send electronic notification of this filing to all counsel of record in the present action.

*/s/Mitchell J Matorin*
Mitchell J. Matorin