## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

SCARLETT PAVLOVICH,

               Plaintiff,

-against-

AMANDA PALMER,

               Defendant.

C.A. NO. 1:25-CV-10263F

**DECLARATION OF DYLAN SCHMEYER IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT AMANDA PALMER'S MOTION TO DISMISS ON THE BASIS OF FORUM NON CONVENIENS**

I, Dylan Schmeyer, declare as follows:

1.     I am an attorney with Kamerman, Uncyk, Soniker & Klein, P.C., counsel to Plaintiff in this action. I make this declaration based on my personal knowledge of the facts herein, and could and would testify to them competently if necessary.

2.     Attached hereto as **Exhibit 1** is a true and correct copy of the Declaration and Report of Jack Wass, submitted in Case No.: 3:25-CV-00078-JDP, U.S. District Court Western District Of Wisconsin

3.     Attached hereto as **Exhibit 2** is a true and correct copy of the Declaration of Scarlett Pavlovich submitted in Case No.: 3:25-CV-00078-JDP, U.S. District Court Western District Of Wisconsin and its Exhibit.

4.     Attached hereto as **Exhibit 3** is a post to Amanda Palmer's Instagram, dated September 17, 2024, and available online at https://www.instagram.com/p/DABXZ85xjMc/.

5.     Attached hereto as **Exhibit 4** is a true and correct copy of the Affidavit of Service made on Amanda Palmer personally at her address in Lexington, MA, filed as ECF No. 9 in Pavlovich v. Palmer, Case No. 1:25-cv-10263 (D. Mass 2025).

1

6. Attached hereto as **Exhibit 5** is a true and correct copy of a quit-claim deed registered as Document No. 638869 in the Dunn County, WI Register of Deeds, showing Mary T. Gaiman as Grantor and Neil R. Gaiman as Grantee for Parcels 16228132813-00005, -00006, -00007, and -00008 in the Town of Menomonie, Wisconsin, as retrieved from the Dunn County portal by my office on April 10, 2025.

7. Attached hereto as **Exhibit 6** is a true and correct copy of the Property Summary for Dunn County, WI Parcel 16228132813-00012 as retrieved from the Dunn County portal by my office on April 10, 2025, showing that it is a child parcel of 16228132813-00006 as deeded to Neil Gaiman in Exhibit 7 and that it is currently owned by Neil R. Gaiman and bears the address of E3988 550th Ave. in Menomonie, WI.

8. Attached hereto as **Exhibit 7** is a true and correct screenshot of a post to Neil Gaiman's account on the social media site Bluesky, @neilhimself.neilgaiman.com, on November 12, 2023, in which he references "the basement of my Wisconsin house." This post is available online at https://bsky.app/profile/neilhimself.neilgaiman.com/post/3ke2d2k6vxs2r.

9. Attached hereto as **Exhibit 8** is a true and correct screenshot of a post to Neil Gaiman's account on the social media site X (formerly known as Twitter), @neilhimself, on September 14, 2020, which reads "You need to add English authors in Wisconsin to your list. I've had a green card since 1992, have four American children, and an American wife." This post is available online at https://x.com/neilhimself/status/1305552827008385024.

10. Attached hereto as **Exhibit 9** is a true and correct copy of the Motion for Admission Pro Hac Vice of Andrew Brettler on behalf of Defendant Neil Gaiman, ECF No. 17 in Pavlovich v. Gaiman, Case No. 3:25-cv-00078, (W.D. Wis.).

2

11. Attached hereto as **Exhibit 10** is a true and correct screenshot showing that Andrew Brettler,

Neil Gaiman's counsel in Pavlovich v. Gaiman, Case No. 3:25-cv-00078, (W.D. Wis.), is

admitted to practice in California. I performed a search for Mr. Brettler in the attorney

registration database for the New Zealand Law Society, the national regulator and representative

body of the legal profession in Aotearoa New Zealand. No Andrew Brad Brettler is registered to

practice law with the New Zealand Law Society.

12. Attached hereto as **Exhibit 11** is a true and correct screenshot of the flight booking information

for a round-trip flight from Edinburgh to Auckland on Wednesday June 11, returning

Wednesday June 25, 2025 as of June 2, 2025.

13. Attached hereto as **Exhibit 12** is a true and correct screenshot of the flight booking information

for a round-trip flight from Edinburgh to Boston on Wednesday June 11, returning Wednesday

June 25, 2025 as of June 2, 2025.

       I declare under penalty of perjury under the laws of the United States that the foregoing is

true and correct to the best of my knowledge.

       Executed this the 4th day of June 2025, at Thornton, CO.

By: ___*/s/ Dylan M. Schmeyer*___
     Dylan M. Schmeyer

# EXHIBIT 1

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| SCARLETT PAVLOVICH,<br><br>                    Plaintiff<br><br>v.<br><br>NEIL GAIMAN, AMANDA<br>PALMER<br><br>                    Defendants | Case No.: 3:25-CV-00078-JDP<br><br><br>**DECLARATION OF JACK WASS** |

1.   My name is Jack Lamar Watson Wass. I am over the age of eighteen, and I am fully competent to make this declaration and testify to the matters asserted herein.

2.   I am a lawyer admitted to the High Court of New Zealand, and practicing as a barrister from Stout Street Chambers in Wellington, New Zealand.

3.   I have been instructed by Wahlberg, Woodruff, Nimmo & Sloane, LLP and Kamerman Uncyk Soniker & Klein, P.C. to provide my opinion on certain matters of New Zealand law arising in the above-captioned proceedings.

4.   A copy of my opinion addressing those questions is attached as **Exhibit A**. I confirm that represents my true and correct professional opinion on the matters addressed.

5.   A copy of my *curriculum vitae* is attached as **Exhibit B**.

6.    I confirm that I am independent of the parties and that my remuneration for attendances associated with the preparation of this report is limited to payment for time spent at an hourly rate, and I have entered into no arrangements under which the amount or payment of my fee is dependent on the outcome.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April 12, 2025.

_____

JACK LAMAR WATSON WASS



# JACK WASS
## BARRISTER

11 April 2025

Lane A. Haygood, Dylan Schmeyer,  Michael Nimmo
Thomas Neville, Akiva M. Cohen  Wahlberg, Woodruff, Nimmo & Sloane, LLP
Kamerman, Uncyk, Soniker & Klein P.C.  4601 DTC Blvd., Suite 950, Denver CO 80237
1700 Broadway, 16th Floor, New York, NY 10019
United States of America

**PAVLOVICH v. GAIMAN & PALMER – OPINION ON NEW ZEALAND LAW**

1.      **Introduction**

1.1     You have requested that I provide my expert opinion on certain questions of New Zealand law arising in the matter of *Scarlett Pavlovich v. Neil Gaiman & Amanda Palmer*, United States District Court for the Western District of Wisconsin, Case No. 25-CV-0078. I have been provided with a copy of the Complaint, the Motion to Dismiss, the Brief in Support, and the Declaration of Neil Gaiman.

1.2     You have asked me to address the following questions:

(a)     Would it be possible to litigate the claims asserted in the Complaint in proceedings in a New Zealand Court? In particular:

(i)      What is the effect of the Accident Compensation Act 2001 on claims for compensatory damages arising out of personal injury?

(ii)     To what extent does New Zealand law provide a civil cause of action for human trafficking equivalent to Title 18, §§ 1581–1597 of the United States Code (**TVPA**)?

(b)     In relation to the "Independent Contracting Agreement" signed by the plaintiff and referred to at paragraph 242 of the Complaint (**the Agreement**), under New Zealand law:

(i)      What principles would the New Zealand Court apply to determine whether the document is a valid and binding agreement?

(ii)     What proceedings would be caught by the jurisdiction and governing law clause in the document?

(c)     What mechanisms are available to collect documents and testimonial evidence from New Zealand in support of substantive proceedings in the United States?

Stout Street Chambers | Level 6, Huddart Parker Building
1 Post Office Square, Wellington 6011, New Zealand
+64 4 917 1087 | +64 21 034 2262
jack.wass@stoutstreet.co.nz

(d)    What is the nature of a New Zealand permanent residence visa?

1.3    As I explain below, my opinion on each of these issues is:

(a)    It would not be possible to bring civil proceedings claiming compensation that are equivalent to those advanced in the Complaint in the New Zealand courts, because:

(i)    The statutory bar in s 317 of the Accident Compensation Act 2001 (**ACC Act**) would prevent the plaintiff from bringing claims for compensatory damages in tort (such as assault or battery) or otherwise in New Zealand, where the claims pleaded in the Complaint arise directly or indirectly out of personal injuries for which cover is available under the ACC Act. This could include where the underlying allegations are non-consensual sexual contact, such that any mental injury arising directly or indirectly out of such would likely be covered by the ACC Act.

(ii)    New Zealand does not have a comprehensive regime of civil liability for human trafficking equivalent to 18 USC §§ 1581–1597. While some of the conduct covered by that statute would give rise to criminal offences under s 98D of the Crimes Act 1961 and other provisions, that statute does not provide a civil right of action. While the court has the power to order reparations, this only arises in criminal prosecutions.

(b)    In relation to the Agreement:

(i)    With respect to the allegation in the Complaint that the Agreement is a sham, New Zealand law will not treat a document as a valid and binding contract where it is not supported by consideration, does not reflect a genuine mutual intention to establish legal relations or was procured by duress.

(ii)    The better view is that the jurisdiction clause in the Agreement would not be interpreted by a New Zealand court to capture the claims pleaded in the Complaint because allegations of human trafficking and personal injury are not "matters relating to [the] agreement".

(c)    New Zealand law allows both documentary and testimonial evidence to be collected for the purpose of foreign proceedings, and treats applications for such assistance as if they were made under the Hague Evidence Convention. Although this regime does not allow general discovery, the High Court may order both compulsory depositions and compulsory production of specific documents, including where these arise out of the discovery phase of United States litigation.

These requests are infrequent but not unusual in New Zealand, and in most cases applications that have been made to the High Court have been granted.

(d)     A New Zealand permanent residence visa permits the holder to live and work in New Zealand without restriction. The holder of a permanent residence visa is not a citizen. Once obtained, such a visa does not require the holder to spend any amount of time in, or maintain any association with, New Zealand. While the holder of a permanent visitor visa may colloquially be described as a "New Zealand permanent resident", they may in fact not be resident in New Zealand, whether permanently or at all.

## 2.     Proceedings in New Zealand

*Accident Compensation Act*

2.1     In 1972, New Zealand fundamentally reformed its approach to compensation for personal injury, *substantially replacing* a common law tort regime with a comprehensive no-fault compensation scheme accompanied by a statutory bar on bringing common law claims. This reform was effected by the Accident Compensation Act 1972, reformed and replaced by a sequence of statutes culminating in the Accident Compensation Act 2001 (**the ACC Act**).

2.2     The ACC Scheme was introduced following the report of a Royal Commission of Inquiry. It found that tort liability based on fault was not serving the interests of society, and proposed that a new comprehensive scheme should be based on a no-fault principle, meaning that a claimant would not be required to establish the fault of anyone else as a prerequisite to compensation (and their own fault would not affect their entitlement).[1]

2.3     The purpose of the Act is specified in s 3:

> "**3      Purpose**
>
> The purpose of this Act is to enhance the public good and reinforce the social contract represented by the first accident compensation scheme by providing for a fair and sustainable scheme for managing personal injury that has, as its overriding goals, minimising both the overall incidence of injury in the community, and the impact of injury on the community (including economic, social, and personal costs), through—
>
> (a)      establishing as a primary function of the Corporation the promotion of measures to reduce the incidence and severity of personal injury:

---

[1] Royal Commission of Inquiry *Compensation for Personal Injury in New Zealand* (Government Printer, Wellington, December 1967) at [488].

(b)    providing for a framework for the collection, co-ordination, and analysis of injury-related information:

(ba)   ensuring that the Corporation monitors access to the accident compensation scheme by Māori and identified population groups in order to deliver services under this Act in a manner that supports access to the scheme by injured Māori and injured persons in those population groups:

(c)    ensuring that, where injuries occur, the Corporation's primary focus should be on rehabilitation with the goal of achieving an appropriate quality of life through the provision of entitlements that restores to the maximum practicable extent a claimant's health, independence, and participation:

(d)    ensuring that, during their rehabilitation, claimants receive fair compensation for loss from injury, including fair determination of weekly compensation and, where appropriate, lump sums for permanent impairment:

(e)    ensuring positive claimant interactions with the Corporation through the development and operation of a Code of ACC Claimants' Rights:

(f)    ensuring that persons who suffered personal injuries before the commencement of this Act continue to receive entitlements where appropriate."

2.4    The Scheme revolves around the concept of "cover" for "personal injury". As I explain in more detail below, where a person has cover, they may be entitled to certain statutory entitlements, and as a corollary of cover will be precluded from bringing civil proceedings for compensation. Disputes about cover and entitlements are principally addressed between the claimant and the Corporation, in internal procedures and appeal to the Accident Compensation Appeals Registry. Alleged wrongdoers are not generally party to such proceedings because the assignment of fault is not the objective of the exercise.

2.5    The concept of "cover" is defined in s 8 to mean cover for a "personal injury" under ss 20, 21 or 22 for a personal injury suffered on or after 1 April 2002. Each of those sections establish different kinds of personal injury.

2.6    The concept of "personal injury" is defined in s 26(1) to mean, so far as relevant to this opinion:

"...

(b)    physical injuries suffered by a person, including, for example, a strain or a sprain; or

(c)    mental injury suffered by a person because of physical injuries suffered by the person; or

4

<blockquote>

(d) mental injury suffered by a person in the circumstances described in section 21; or

(da) work-related mental injury that is suffered by a person in the circumstances described in section 21B; ..."

</blockquote>

2.7    The terms "physical injury" and "mental injury" have been considered by case law:

(a)    "Physical injury" is not defined in the Act. Case law has held that it requires some appreciable and not wholly transitory impact on the person, but need not necessarily be long-standing or cause serious bodily harm.[2]

(b)    "Mental injury" is defined in s 27 to mean "a clinically significant behavioural, cognitive, or psychological dysfunction".

2.8    Reflecting that distinction between physical and mental injuries:

(a)    Section 20 provides a person cover for a personal injury if: (a) he or she suffers the personal injury in New Zealand on or after 1 April 2002; (b) the personal injury is one of the kinds of injuries described in s 26(1)(a), (b), (c) or (e) quoted above; and (c) the injury is (relevantly for the purpose of this opinion) "personal injury caused by an accident to the person".[3] Importantly, "accident" is defined to include "a specific event or series of events, other than a gradual process, that...involves the application of a force..., or resistance, external to the human body". It follows that an "accident" includes intentional acts such as physical assault by another person.[4]

(b)    A person will have cover for a mental injury that is suffered "because of" physical injuries. A mental injury will not be covered if the physical injury merely made the symptoms of a pre-existing mental injury, such as depression, worse.[5] However, it is not necessary to show causation on a "but for" basis: it is sufficient to establish cover where there are multiple causes that there is a genuine and meaningful connection between the physical injury and the mental injury.[6]

(c)    Section 21 provides a person cover for a personal injury that is a "mental injury" if (a) he or she suffers the mental injury inside or outside New Zealand on or after

---

[2] *Allenby v H* [2012] NZSC 33, [2012] 3 NZLR 425 at [56]. So for example a mere invasion of the integrity of the body by way of sexual assault without evidence of even minor injury (such as appreciable impact to bodily tissue or skeletal structure) was not a physical injury (*Murray v ACC* [2013] NZHC 2967 at [60]), although it would likely give rise to cover under s 21 discussed next.

[3] There are numerous other categories of personal injury other than injury by accident listed in s 20(2), but that are not relevant for the purpose of this report.

[4] *Couch v Attorney-General* [2010] NZSC 27, [2010] 3 NZLR 149.

[5] *Hornby v ACC* [2009] NZCA 576 at [36]-[37].

[6] *W v Accident Compensation Corporation* [2018] NZHC 937, [2018] 3 NZLR 859 at [67]-[68].

1 April 2002; (b) the mental injury is caused by an act performed by another person; and (c) is an act of a kind described in subsection (2). That subsection relevantly requires that the act is "performed on, with, or in relation to the person"; (b) is performed in New Zealand or outside New Zealand where the victim is ordinarily resident in New Zealand; and (c) is within the description of an offence listed in Schedule 3. That Schedule lists a number of offences in the Crimes Act, including various offences associated with sexual violation, inducing sexual connection by threat and indecent assault, but not including s 98D.[7] Subsection (5) makes it clear that for the purpose of the section, it is irrelevant that (a) no person can be, or has been, charged with or convicted of the offence; or (b) the alleged offender is incapable of forming criminal intent. The factor that determines cover is whether the act is "within the description of an offence" listed in Schedule 3, so it is only necessary to demonstrate the actus reus.[8] The test for causation is the same as the test for causation in respect of mental injuries developing because of "physical injuries". Namely, the actus reus needs to be a "material cause", as opposed to a minimal cause, of the mental injury.[9]

2.9     It follows that a person who has suffered sexual abuse or conduct of the kind alleged in the Complaint would have cover if and to the extent that:

(a)     they have suffered physical injury, even if minor, as a result of force applied to them;

(b)     they have suffered a mental injury, such as post-traumatic stress disorder or depression, which a physical injury suffered in the context of human trafficking has meaningfully contributed to; or

(c)     they have suffered a mental injury caused by one of the acts listed in Schedule 3 of the Crimes Act in the course of the conduct.

2.10    A person who has suffered a personal injury for which they have cover may be then be entitled to certain "entitlements" as provided for in the legislation: s 67. The general categories of entitlements are: rehabilitation; "first week compensation" and "weekly compensation" for persons who were employed around the time of the injury or

---

[7] See **Appendix**.

[8] *KBS v ACC* [2012] NZCA 82, [2012] NZAR 578 where the victim had cover for mental injuries arising out her partner having unprotected intercourse with her without disclosing that he was HIV-positive; it was sufficient to show that the acts underlying the offence of sexual violation by rape (intercourse and want of consent) were present, without proving the mental element (absence of a reasonable belief in consent).

[9] See *Roper v Taylor* [2023] NZSC 49, [2023] 1 NZLR 1 at [62]; and *AB v Attorney-General* HC Wellington CIV-2006-485-2304, 22 February 2011, at [379] and [410].

6

incapacity; lump sum compensation for permanent impairment; and certain grants for families of deceased persons: s 69 and Schedule 1.[10]

2.11    It is important to emphasise that the philosophy and scheme of entitlements under the ACC represent a fundamentally different approach to compensation for personal injuries than the common law. The attribution of fault plays no role in the regime, which treats accidents as a matter of collective community responsibility. With its focus on allowances for rehabilitation, capped earnings-related compensation, and modest awards for permanent impairment, the scheme has elements of a (compulsory) insurance scheme and some features of a social welfare scheme.[11]

2.12    The Act formerly provided compensation for pain and suffering (non-economic loss). That entitlement was abolished in 1992, so that the Act no longer provides separately for the emotional consequences of injuries, such as trauma, and other non-economic loss.[12]

2.13    A person who claims to be covered under s 21 (for mental injury arising out of criminal acts) may be entitled to certain rehabilitative entitlements under the "sensitive claims" process, including sessions up to a maximum number of hours with a provider who may or may not be a psychiatrist depending on the nature of the claim.[13] There is no provision to receive payment on account of the cost of future rehabilitative needs.

2.14    The level of whole body impairment (from a minimum to 10% to a maximum of 80%) is calculated using the American Medical Association's Guides to the Evaluation of Permanent Impairment, from $4,162.20 (for 10% impairment) to $166,487.44 (for 80% impairment, in each case for the 2023-2024 year).[14] A person may have cover for a personal injury but no entitlement to lump sum compensation for impairment.

*The statutory bar*

2.15    The Woodhouse Report which led to the creation of the Scheme found that any personal injury scheme would also need to be comprehensive in order to be effective. At the heart of the Scheme is the "statutory bar" in s 317, which provides:

"**317 Proceedings for personal injury**

---

[10] The rules on when a covered person is entitled to particular entitlements are complex. I have provided a general summary below but have not been asked to express an opinion on what entitlements might be available on the facts of the particular case.

[11] The Scheme is funded by levies collected from various sources, including levies paid by employers.

[12] Accident Rehabilitation Compensation and Insurance Act 1992.

[13] ACC "Sensitive Claims Service: Operational Guidelines" (February 2025) available at www.acc.co.nz.

[14] See https://www.acc.co.nz/assets/oia-responses/permanent-impairment-assessment-details-oia-response-gov-027318.pdf.

(1)   No person may bring proceedings independently of this Act, whether under any rule of law or any enactment, in any court in New Zealand, for damages arising directly or indirectly out of—

   (a)   personal injury covered by this Act; or

   (b)   personal injury covered by the former Acts.

(2)   Subsection (1) does not prevent any person bringing proceedings relating to, or arising from,—

   (a)   any damage to property; or

   (b)   any express term of any contract or agreement (other than an accident insurance contract under the Accident Insurance Act 1998); or

   (c)   the unjustifiable dismissal of any person or any other personal grievance arising out of a contract of service.

(3)   However, no court, tribunal, or other body may award compensation in any proceedings referred to in subsection (2) for personal injury of the kinds described in subsection (1).

(4)   Subsection (1) does not prevent any person bringing proceedings under—

   (a)   section 50 or section 51 of the Health and Disability Commissioner Act 1994; or

   (b)   any of sections 92B, 92E, 92R, 122, 122A, 122B, 123, or 124 of the Human Rights Act 1993.

(5)   Subsection (1) does not prevent any person bringing proceedings in any court in New Zealand for damages for personal injury of the kinds described in subsection (1), suffered in New Zealand or elsewhere, if the cause of action is the defendant's liability for damages under the law of New Zealand under any international convention relating to the carriage of passengers.

(6)   Subsection (1) does not affect proceedings to which section 318(3) applies.

(7)   Nothing in this section is affected by—

   (a)   the failure or refusal of any person to lodge a claim for personal injury of the kinds described in subsection (1); or

   (b)   any purported denial or surrender by any person of any rights relating to personal injury of the kinds described in subsection (1); or

   (c)   the fact that a person who has suffered personal injury of the kinds described in subsection (1) is not entitled to any entitlement under this Act."

2.16    The following points should be noted about the operation of the statutory bar:

(a)    The touchstone of the statutory bar is cover: where a person has a personal injury which is covered under the ACC Scheme, they are prohibited from suing. The statutory bar applies irrespective of whether the claimant has actually made a claim under the Scheme or the level of any entitlements (or indeed, whether they are entitled to any entitlements at all).

(b)    It follows that the statutory bar does not operate as a cap on damages: it is a prohibition on suing for compensatory damages arising from personal injuries.

(c)    The statutory bar precludes a victim from bringing claims "under *any rule of law* or any enactment" — it is not limited to particular causes of action but certainly includes tort claims.

(d)    The statutory bar applies to damages "arising directly *or indirectly*" out of a covered personal injury. This means that the statutory bar will still apply to a claim that arises out of a covered injury, even if the particular type of damages claim is not covered under the Scheme.[15]

(e)    Although the statutory bar does not prevent a victim bringing the kinds of proceedings described in subsection (2) — such as unjustifiable dismissal in an employment context — entirely, they cannot receive compensation for personal injury in those proceedings.[16] There are separate carve-outs for specific statutory claims under subsection (4) and claims under international carriage conventions under subsection (5) which do not apply here.[17]

2.17    I note that the statutory bar does not preclude claims for exemplary or punitive damages arising out of conduct that has resulted in a personal injury: such claims are expressly preserved by s 319.[18] This requires the plaintiff to establish "truly outrageous conduct" and the courts have made it clear that such awards must contain no element of compensation for harm suffered by the claimant and must be kept to "moderate" levels.[19]

---

[15] For example, in *Attorney-General v B* [2002] NZAR 809 (CA) at [23]–[26] police officers sued for breach of contract arising out of carrying out dangerous police operations that so severely affected them that they left the force. They alleged humiliation and hurt feelings which they said had not been compensated for but those claims were barred because the appropriate focus is not the type of damages but whether they derive from a covered personal injury.

[16] See discussion at [2.32] below.

[17] No carve-out for claims under the Anti-Trafficking Protocol were added to the legislation, which reflects the fact that there is no right of civil action for breach of s 98D of the Crimes Act. This is discussed below.

[18] The carve-out for exemplary damages claims was originally recognized in case law, on the basis that they were not compensation for personal injury, and subsequently codified. For the same reason, purely declaratory relief is not barred: *Re Chase* [1989] 1 NZLR 325 (CA).

[19] *Donselaar v Donselaar* [1982] 1 NZLR 97 (CA) at 107, 109, 112 and 116.

There have been relatively few claims for exemplary damages for covered personal injuries arising out of sexual abuse in recent years, and fewer successful ones. A review in 2005 identified 9 such cases,[20] and I have identified no cases analogous to the present since then.[21]

2.18    Section 321 of the ACC Act recognises that in some circumstances, a person who has cover for a personal injury may still have a right to bring proceedings: it is "a general catchall aimed at preventing double recovery and, if appropriate, a subrogation-type intervention by ACC".[22] It contemplates the possibility that a person who has cover and is therefore barred from bringing proceedings in New Zealand may nevertheless be entitled to bring proceedings in a foreign country:[23]

> "... in relation to proceedings outside New Zealand, s 321 does no more than recognise the reality that New Zealand legislation cannot control the conduct of foreign courts, and that persons who have cover under the ACC Act may obtain compensation in a foreign jurisdiction under foreign law. In those circumstances ACC, through the claimant, may take the opportunity to recover what it has spent by enforcing the right of action overseas. Alternatively, a claimant can be required to pay back to ACC any damages received up to the amount of cover received by that claimant under the ACC Act."

2.19    Section 321 provides:

> "**321 Powers of Corporation when person has right to bring proceedings**
>
> (1)    Subsection (2) applies when—
>
>        (a)    any entitlement is required to be provided under this Act for personal injury to a person; and
>
>        (b)    the person has the right to bring proceedings for damages in New Zealand or elsewhere for the personal injury.

---

[20] *McDermott v Wallace* [2005] 3 NZLR 661 (CA) at [97]. That included awards for $85,000 and $100,000 in each case for prolonged pattern of abuse throughout marriage; the remaining awards did not exceed $40,000.

[21] This may be in part attributable to the expanded availability of reparations under the Sentencing Act 2002 since 2014: see [2.31] below.

[22] *McGougan v DePuy International Ltd* [2018] NZCA 91, [2018] 2 NZLR 916 at [48].

[23] *McGougan v DePuy International Ltd* [2018] NZCA 91, [2018] 2 NZLR 916 at [47]. The Act leaves it up to the foreign court to decide whether to give effect to the statutory bar in s 317: it neither mandates nor excludes the application of the bar. That it is matter for foreign law: see *Allen v DePuy International Ltd* [2015] EWHC 926 (QB) at [49] (where the English court had to decide whether the statutory bar applied to proceedings brought in that country by New Zealanders who had received allegedly defective hip implants).

    (2)    When this subsection applies, the Corporation may require a person to do one of the following things, at the person's option and at the Corporation's expense:

        (a)    to take all reasonable steps to enforce the right; or

        (b)    to assign the right to the Corporation, and to do all other things necessary to enable the right to be enforced by the Corporation, within a reasonable period.

    (3)    Subsection (4) applies when—

        (a)    any entitlement has been or is required to be provided under this Act for personal injury to a person; and

        (b)    the person has received a sum of money by way of damages, compensation, or settlement of any claim in New Zealand or elsewhere for the personal injury.

    (4)    When this subsection applies, the Corporation may, as the case requires,—

        (a)    deduct, from the cost of the entitlement required to be provided to a person, a sum equivalent to the net amount received by way of damages, compensation, or settlement; or

        (b)    recover from the person, as a debt due, the entitlement provided.

    (5)    Nothing in subsection (4) applies to—

        (a)    any money paid on a claim by the person under an insurance contract (other than an accident insurance contract under the Accident Insurance Act 1998) taken out by the person:

        (b)    any payment from a retirement scheme (within the meaning of section 6(1) of the Financial Markets Conduct Act 2013):

    ...

        (d)    any damages awarded under any Act."

2.20    By way of example, the Corporation has successfully clawed back money from a settlement entered into by the claimant in the United States arising from a helicopter accident in that country.[24]

*TVPA*

2.21    Based on my review of the Complaint, I understand that the plaintiff pleads eight causes of action against the first defendant.

---

[24] *Schlaadt v Accident Rehabilitation and Insurance Corp* [2000] 2 NZLR 318 (HC).

2.22   The first four causes of action allege that the defendants are liable for human trafficking or conspiracy to commit the same, in violation of 18 USC §§ 1589—1595;

2.23   The fifth, sixth, seventh and ninth causes of action are pleaded in tort, and allege that Mr Gaiman is liable for assault, battery, intentional infliction of emotional distress and negligent infliction of emotional distress respectively.[25]

2.24   I have been provided with a copy of Title 18, Chapter 77 of the United States Code, which is headed "Peonage, Slavery, and Trafficking in Persons". I understand that:

(a)   18 USC § 1589 prohibits forced labour, which includes obtaining labour of services of a person by various proscribed means, including use and threats of force or physical restraint, use or threats of serious harm, and abuse or threatened abuse of legal process;

(b)   18 USC § 1590 prohibits trafficking, which includes harbouring, transporting, providing or obtaining a person for labour or services in violation of Chapter 77;

(c)   18 USC § 1591 prohibits sex trafficking, which includes various acts done knowing that means of force, threats of force, fraud, certain coercion, or a combination will be used to cause the person to engage in a commercial sex act;

(d)   18 USC § 1594 provides for accessory liability.

2.25   Each of those clauses provide for the relevant conduct to be punishable as a criminal offence. 18 USC § 1595 then provides a civil remedy in respect of the conduct criminalised by the preceding provisions in the following terms:

> "**(a)** An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees."

2.26   The Brief in Support (pp 9–10) argues that:

> "New Zealand has comprehensive laws governing the claims Plaintiff alleges, either through its criminal human trafficking statutes (that provide for restitution), international anti-human trafficking treaties New Zealand has ratified (i.e., the Palermo Accords), or through its common law derived from the same English common law system that is the basis for common law in the USA."

---

[25] In addition, the plaintiff pleads a single cause of action of negligence against Ms Palmer alone.

2.27 I do not consider the defendant's statement of New Zealand law, as quoted above, as an accurate statement of New Zealand law. In particular, I do not consider that Ms Pavlovich could pursue civil claims in New Zealand for compensation from Mr Gaiman equivalent to those pleaded in the Complaint.

2.28 New Zealand has ratified the United Nations Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially Women and Children (**the Anti-Trafficking Protocol**).[26] As part of its implementation of the Anti-Trafficking Protocol,[27] New Zealand enacted s 98D of the Crimes Act 1961, which creates an offence of human trafficking punishable by 20 years' imprisonment and/or a fine of up to $500,000:[28]

> "**98D Trafficking in persons**
>
> (1) Every person is liable to the penalty stated in subsection (2) who arranges, organises, or procures—
>
>> (a) the entry of a person into, or the exit of a person out of, New Zealand or any other State—
>>
>>> (i) for the purpose of exploiting or facilitating the exploitation of the person; or
>>>
>>> (ii) knowing that the entry or exit of the person involves 1 or more acts of coercion against the person, 1 or more acts of deception of the person, or both; or
>>
>> (b) the reception, recruitment, transport, transfer, concealment, or harbouring of a person in New Zealand or any other State—
>>
>>> (i) for the purpose of exploiting or facilitating the exploitation of the person; or
>>>
>>> (ii) knowing that the reception, recruitment, transport, transfer, concealment, or harbouring of the person involves 1 or more acts of coercion against the person, 1 or more acts of deception of the person, or both.
>
> (2) The penalty is imprisonment for a term not exceeding 20 years, a fine not exceeding $500,000, or both.
>
> (3) Proceedings may be brought under this section even if—

---

[26] I note that the Brief in Support describes this as "the Palermo Protocol". The term "Palermo Protocols" is generally used to refer to three protocols to the United Nations Convention Against Transnational Organized Crime, the other two concerning smuggling of migrants and illicit manufacturing and trafficking in firearms. I therefore refer to the relevant protocol as the Anti-Trafficking Protocol.

[27] The amendment was made by the Crimes Amendment Act 2015, originally part of the Organised Crime and Anti-corruption Legislation Bill (291–1).

[28] Relevant definitions are provided in s 98B.

(a) parts of the process by which the person was exploited, coerced, or deceived were accomplished without an act of exploitation, coercion, or deception:

(b) the person exploited, coerced, or deceived—

(i) did not in fact enter or exit the State concerned; or

(ii) was not in fact received, recruited, transported, transferred, concealed, or harboured in the State concerned.

(4) For the purposes of this section, exploit, in relation to a person, means to cause, or to have caused, that person, by an act of deception or coercion, to be involved in—

(a) prostitution or other sexual services:

(b) slavery, practices similar to slavery, servitude, forced labour, or other forced services:

(c) the removal of organs."

2.29    A prosecution under s 98D may only be brought with the consent of the Attorney-General.[29]

2.30    In my opinion, the New Zealand court would not interpret these provisions as being enforceable by civil action. Although one of the purposes of the sections in the Crimes Act is to protect an identifiable class of people, Parliament contemplated that the appropriate mode of enforcement was criminal sanction and did not include a civil remedy.[30] There is no provision in New Zealand law equivalent to 18 USC § 1595 conferring a civil right of action for breach of s 98D of the Crimes Act. While New Zealand law recognises a tort of breach of statutory duty, this is available only where the plaintiff can show as a matter of construction that Parliament intended the section to confer a civil right of action in addition to the penalty provided.[31]

2.31    For completeness, I note that s 32(1) of the Sentencing Act 2002 allows the court, when sentencing an offender for a criminal offence, to impose a sentence of reparation if they

---

[29] Although not mentioned in the Brief in Support, s 16 of the Prostitution Reform Act 2003 (which decriminalised prostitution in New Zealand) also makes it a criminal offence to commit certain acts (such as improper use of power arising from a relationship) with the intent of inducing or compelling a person to provide commercial sexual services. That section only applies where the services in question are provided on a commercial basis, so does not capture a case where the victim is compelled to provide sexual services for free: *Connolly v R* [2010] NZCA 129 at [45].

[30] See, consistently, Organised Crime and Anti-corruption Legislation Bill (291—1) (explanatory note) and Prostitution Reform Bill (66—2) (select committee report).

[31] See *Select 2000 Ltd v ENZA* [2002] 2 NZLR 367 at [26] and Stephen Todd (gen ed) *Todd on Torts* (Thomson Reuters) at [7.2].

14

have caused a person to suffer emotional harm.[32] However, s 32 does not allow a civil claim for compensatory damages. Reparation is only available where an offender has been prosecuted and convicted:[33] it forms part of the sentencing exercise. This means that reparations are only available where the elements of the offence can be established beyond reasonable doubt, whereas a civil right of action need only be established on the balance of probabilities. Prosecutions are conducted on behalf of the state after an investigation by the Police.[34] To my knowledge, the only two prosecutions have been brought under s 98D. Each involved a different factual scenario to the present case where the employer brought the workers in from overseas and there was no element of sexual assault. In one, reparations of $28,167 were ordered to be paid to each victim for out-of-pocket expenses,[35] and in the other $183,000 was spread between 13 victims.[36] In both of these cases, reparation payments had an effect on the periods of imprisonment imposed.[37] This reinforces the payments are a part of a punitive, rather than compensatory, regime in New Zealand and is only available in cases of criminal prosecution.

2.32    It is likely that Parliament did not consider that it was appropriate to confer a civil right of action for compensatory damages[38] because claims for compensation for personal injury do not generally form part of New Zealand law as a consequence of the statutory bar in the Accident Compensation scheme, as I have discussed above.[39] Victims would have

---

[32] Where a victim has cover under the ACC scheme, the order for reparations can "top up" their ACC entitlements: *McGougan v DePuy International Ltd* [2018] NZCA 91, [2018] 2 NZLR 916 at [49].

[33] Or discharged without conviction in which case the elements of the offence must still be established.

[34] Although it is possible to bring private prosecutions in New Zealand, these are rare and a person bringing a private prosecution does not have the benefit of the investigatory powers of the Police.

[35] *R v Ali* [2016] NZHC 3077.

[36] Out of money forfeited under the Criminal Proceedings (Recovery) Act 2009: *R v Matamata* [2020] NZHC 1829 at [86].

[37] *R v Ali*, above n 35, at [63] where the reparation payment resulted in a reduction in the end sentence of imprisonment imposed; and *R v Matamata*, above n 36, at [81] where the reparation payment made up part of the reasons why imposing a higher minimum period of imprisonment (than the automatic minimum period of imprisonment in New Zealand for cases other than murder, which is one third of the sentence imposed) was inappropriate in the circumstances.

[38] See Ministry of Business, Innovation and Employment *Combatting Modern Forms of Slavery: Plan of Action Against Forced Labour, People Trafficking and Slavery 2020-2025* (December 2022); and Article 6.6 of the Anti-Trafficking Protocol.

[39] Common law tort claims, such as for false imprisonment, conspiracy or assault would also be available in theory if they did not arise directly or indirectly out of a personal injury in respect of which cover was available under the ACC Act.

access to publicly funded health care,[40] and where victims are employees they may have recourse in the specialist employment jurisdiction.[41]

2.33    It follows that I do not consider the brief in support is accurate when it says that New Zealand's "criminal human trafficking statutes … provide for restitution".[42]

2.34    The brief in support states that "civil actions are available through the New Zealand Disputes Tribunal and have been awarded to victims of trafficking."[43] This appears to be a reference to a 2001 case where a woman was reported to have recovered $6,000 she had paid to her traffickers for work in a restaurant in New Zealand. On the basis of the summary provided,[44] it appears to me that the claimant in that case sought reparation of out-of-pocket expenses she had paid to secure her New Zealand job[45] rather than damages for any physical or emotional harm.

2.35    The Disputes Tribunal is a small claims tribunal whose jurisdiction is limited to claims of up to $30,000: s 10 of the Disputes Tribunal Act 1988.[46] Its role under s 18 is to assist the parties to negotiate an agreed resolution and where this is not possible to determine the dispute "according to the substantial merits and justice of the case, and in doing so shall have regard to the law but shall not be bound to give effect to strict legal rights or obligations or to legal forms or technicalities." The statutory bar under s 317 of the ACC Act applies to claims for compensatory damages for personal injury in the Disputes Tribunal.

2.36    I am not aware of any case where a plaintiff has brought civil compensation claims similar to the TVPA claims advanced in the Complaint in the New Zealand judicial system, whether in the Disputes Tribunal or the courts.

---

[40] Clause B12 of the Health and Disability Services Eligibility Direction 2011 under the New Zealand Public Health and Disability Act 2000.

[41] See, eg, *Courage v Attorney-General* [2022] NZEmpC 77 (slavery/forced labour in the context of a religious community). The Employment Relations Authority and Employment Court also have the power to award compensation for personal grievances (which can include sexual harassment) and for other breaches of employment obligations.

[42] I note "restitution" is not recognized as a cause of action synonymous with "compensation for harm". Where that term is used in New Zealand law, it generally refers to the remedy for unjust enrichment (for example, where money is paid under a mistake).

[43] Citing Susan Coppedge "People Trafficking: An International Crisis Fought at the Local Level" (Fulbright New Zealand, July 2006).

[44] Disputes Tribunal decisions are not published a matter of course, and the source which the author cites for that was a periodical published by the New Zealand Human Rights Commission.

[45] Section 12A of the Wages Protection Act 1983 prohibits employers from charging a premium for employment and allows employees to recover the sum as a debt due.

[46] A bill is currently before Parliament that if passed would increase this to $60,000.

16

2.37    To the extent that proceedings could be brought in New Zealand, the High Court has a discretion to require a plaintiff who is resident out of New Zealand to give security for anticipated costs as a condition of proceeding with the claim.[47] The general rule is that an unsuccessful party in a proceeding will be ordered to pay costs (in respect of lawyers' fees) and disbursements to the successful party. These are calculated by reference to a prescribed scale intended to represent a contribution to the other side's costs (but not, barring exceptional cases, an indemnity).[48]

2.38    Finally, I note that there are no formal mechanisms to coordinate New Zealand proceedings with parallel proceedings arising out of the same facts pending in the United States.[49]

**3.      Independent Contracting Agreement**

*Overview*

3.1     I have been asked to explain the legal principles that a New Zealand court would apply to the "Independent Contracting Agreement" referred to at [242] of the Complaint and produced as Exhibit C to Mr Gaiman's Declaration.

3.2     I understand that the Complaint alleges this was an employment agreement but was a sham, which Mr Gaiman required Ms Pavlovich to sign before he would pay her rent money that he had promised.

3.3     The Motion says that the Agreement reflected Ms Pavlovich's status as an independent contractor, not an employee. It refers to clause 16 of the Agreement and argues that the parties had an "intention to submit [their dispute] to the exclusive jurisdiction of New Zealand" (page 20–21).

3.4     I have been asked to comment on the principles of New Zealand law applicable to:

(a)     allegations that an agreement is a sham or related doctrines; and

(b)     the scope of jurisdiction and choice of law provisions in contracts.

---

[47] High Court Rules 2016, r 5.45.

[48] High Court Rules 2016, Part 14 and Schedules 2-3. In calculating security, the Court will take into account the likely about of costs that would be payable at the end of the proceedings alongside other factors.

[49] Outside the context of specific areas of law, such as insolvency. While the New Zealand Court might have regard to the status of parallel proceedings in conducting its own procedure and in that sense may informally cooperate, and has the power to assist in gathering evidence, there is no mechanism analogous to what I understand of the multidistrict litigation procedure in the United States.

*Principles applicable to "sham" contracts*

3.5     The elements of a binding contract in New Zealand law are: agreement of sufficient certainty (usually consisting of offer and acceptance), consideration, and intention to create legal relations.[50] The general rule is that a promise to do nothing more than the promisor is already contractually obliged to do will not constitute sufficient consideration.[51]

3.6     The starting point with ordinary commercial contracts is that where the parties have recorded their agreement in a written contract supported by consideration that will be taken as an outward manifestation of their intention to create legal relations (ie, to be legally bound).

3.7     However, New Zealand law recognises that this position will be displaced in certain circumstances. I note two particular doctrines of relevance.

3.8     First, the courts have recognised that a purported contractual agreement recorded in a written document may be a sham. The Supreme Court has held:[52]

> "A document will be a sham when it does not evidence the true common intention of the parties. They either intend to create different rights and obligations from those evidenced by the document or they do not intend to create any rights or obligations, whether of the kind evidenced by the document or at all"

3.9     The court will assess whether the transaction was intended to be genuine, focusing on the words and conduct of the parties, both contemporary and subsequent, reflecting "the conceptual basis of the sham doctrine which lies in the court's ability to see through acts or documents intended to disguise or conceal the truth of the matter."[53] I note for completeness that the question of whether a contract created an employment relationship or an independent contractor relationship is determined according to an established set of rules, and the label ascribed to the relationship by the parties is not determinative because the parties cannot contract out of employment protections if that is the true nature of their relationship.[54]

---

[50] See generally Finn et al *Burrows, Finn & Todd on the Law of Contract in New Zealand* (6 ed, LexisNexis NZ Ltd, Wellington, 2018) at [3.1].

[51] *Antons Trawling Co Ltd v Smith* [2001] 2 NZLR 23 (CA) (holding that a practical benefit associated with a variation may qualify and where duress is not present).

[52] *Ben Nevis Forestry Ventures Ltd v Commissioner of Inland Revenue* [2008] NZSC 115, [2009] 2 NZLR 289 at [33].

[53] *Clayton v Clayton* [2015] NZCA 30, [2015] 3 NZLR 293 at [61]–[61] (internal quotation marks omitted); appeal dismissed: *Clayton v Clayton* [2016] NZSC 29, [2016] 1 NZLR 551 at [117].

[54] Employment Relations Act 2000, s 6. Also see *Rasier Operations BV v E Tū Inc* [2024] NZCA 403 (2024) 20 NZELR 813 (currently under appeal although the principles are well established).

18

3.10    Second, a contract may be voidable for economic duress. The test to determine whether a contract has been procured by duress is often expressed in two limbs: there must have been the exertion of illegitimate pressure on a victim; and the imposition of that pressure must have compelled the victim to enter the contract.[55]

3.11    In assessing whether the pressure is illegitimate and has resulted in the entry into the contract, the court will consider whether the effect of that pressure was to leave the victim with "an absence of practical choice".[56]

3.12    The threat of unlawful conduct will generally constitute illegitimate pressure, and the most common scenario is where a contracting party threatens not to perform their contractual obligations. For example, duress was found to have been present where a husband deliberately ceased paying child support to his former wife, which forced her to obtain a social welfare benefit which had the consequence of releasing him from his child support obligations.[57]

3.13    However, it is not essential that the parties are already in a contractual relationship, and in some circumstances illegitimate pressure will be found to exist in conduct that is otherwise lawful albeit it will be a rare case where simply threatening not to *enter* into a contract will constitute an illegitimate threat. The doctrine of duress has been recognised to include cases where the defendant uses "reprehensible means" to procure the outcome, such as where:[58]

> the defendant, having exposed himself to a civil claim by the claimant, for example, for damages for breach of contract, deliberately manoeuvres the claimant into a position of vulnerability which the law regards as illegitimate and thereby forces the claimant to waive his claim

*Interpretation of clause 16*

3.14    Clause 16 reads:

        "**16.  GOVERNING LAW AND JURISDICTION**

---

[55] *McIntyre v Nemesis DBK Ltd* [2009] NZCA 329, [2010] 1 NZLR 463 at [20]. Duress may also arise from violence or threats of violence calculated to produce fear of bodily harm.

[56] *Attorney-General for England and Wales v R* [2002] 2 NZLR 91 (CA) at [62]; appeal dismissed *Attorney-General for England and Wales v R* [2004] 2 NZLR 577 (PC). A victim may lose the right to avoid a contract for duress where they have affirmed it.

[57] *Barnes v Barnes* [2012] NZCA 255, [2012] NZFLR 617. This will also capture conduct that is unlawful for other reasons, such as conduct constituting a tort.

[58] *Pakistan International Airline Corporation v Times Travel (UK) Ltd* [2021] UKSC 40 at [4]. That is an English case but would be regarded as persuasive in New Zealand, where "lawful act duress" seems to have been recognized as part of the law but not yet successfully invoked: see *Dold v Murphy* [2020] NZCA 313, [2021] 2 NZLR 834.

19

> This agreement is governed by New Zealand law. The parties submit
> to the exclusive jurisdiction of the New Zealand courts in respect of
> all matters relating to this agreement."

3.15    As a preliminary matter, I note that a New Zealand court would treat a provision such as
clause 16 as being directed at two distinct issues. The first issue (governing law) is what
substantive rules of law govern matters relating to the Agreement. The second issue
(jurisdiction) is what courts have jurisdiction over those matters.

3.16    So far as the relationship between the validity of the Agreement and clause 16 is
concerned, I note:

(a)     Under New Zealand law, jurisdiction agreements are regarded as independent
from the substantive contract in which it is contained. If the substantive contract
is voidable, then the jurisdiction clause will also be voidable where it is affected
by the same allegations.[59]

(b)     A choice of law provision must, meanwhile, be "bona fide and legal".[60] This
requirement has not been discussed in detail in New Zealand cases, but in my
view it aligns with the considerations that would apply to an assessment of
whether the jurisdiction agreement was voidable.

3.17    I now address the construction of clause 16 on the assumption it is valid and enforceable.

3.18    The scope of a jurisdiction clause is a matter of contractual interpretation.[61] Under New
Zealand law, the proper approach to contractual interpretation is an objective one, the
aim being to ascertain "the meaning which the document would convey to a reasonable
person having all the background knowledge which would reasonably have been available
to the parties in the situation in which they were at the time of the contract".[62]

3.19    In the context of commercial contracts that include an arbitration clause, English courts
start from the assumption that rational business people are likely to have intended any
dispute arising out of the relationship they have entered into by decided by the same
tribunal (without focusing unduly on distinctions between phrases like "arising under" or
"arising in connection with") unless the wording makes it clear that the parties intended
to limit the scope of the clause.[63] While that principle has been applied to jurisdiction

---

[59] Maria Hook and Jack Wass *The Conflict of Laws in New Zealand* (LexisNexis, Wellington, 2020) [**Hook
& Wass**], at [2.407]-[2.408] (noting as an example of a situation where the jurisdiction clause might
survive an attack on the substantive contract being where the jurisdiction clause was added at the
initiative of the person resisting its enforcement).

[60] *Vita Food Products Inc v Unus Shipping Co Ltd (in liq)* [1939] AC 277 (PC) at 290.

[61] Hook & Wass, above n 61, at [2.410] and the cases there cited.

[62] *Firm PI 1 Ltd v Zurich Australia Insurance Ltd* [2014] NZSC 147, [2015] 1 NZLR 432 at [60].

[63] *Fiona Trust & Holding Corp v Privalov* [2007] UKHL 40 at [27].

20

agreements, it has less application outside the context of commercial contracts. The meaning of a jurisdiction clause remains a matter of contractual construction, and although it will be a matter for the court ultimately determining the issue, I do not consider it likely that a New Zealand court would regard the allegations made in the Complaint as being "matters relating to this agreement" that were subject to the exclusive jurisdiction clause. The Agreement does not purport to regulate the kind of claims that Ms Pavlovich has alleged against Mr Gaiman in the Complaint.

3.20    Finally, I note that the Agreement also contains a dispute resolution provision (clause 14) which applies to "any dispute or difference ... between the parties in connection with or arising out of this agreement or its performance" and purports to require arbitration. The task of rationalising apparently contradictory dispute clauses is, in principle, a matter of interpretation. I do not discuss that exercise further given that no party has sought to rely on the arbitration clause.

3.21    The scope of a *choice of law* clause is also a matter of interpretation. As a general proposition, the proper law of a contract (ie the law identified by a choice of law provision) will govern issues that are characterised as contractual, but not issues that are not contractual. In this case, clause 16 refers to "matters relating to this agreement" and does not purport to address claims outside the scope of the Agreement.[64]

## 4.    Matters of evidence collection in New Zealand

4.1    I have been asked to comment on the mechanisms available for the collection of evidence in New Zealand to assist foreign proceedings.

4.2    There are mechanisms in New Zealand law by which the High Court can assist in the collection of evidence, both documentary and testimonial, for the purpose of proceedings overseas. I do not consider the summary at pp 16-17 of the Defendant's Brief is an accurate account of New Zealand law.

4.3    Section 184–187 of the Evidence Act 2006 provide for the High Court to assist in the collection of evidence. Although it is correct that New Zealand is not a party to the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, ss 184–187 were enacted in anticipation of New Zealand acceding to the Convention. The consequence is that the High Court has the same power to assist with the collection of evidence for foreign proceedings as it would have if New Zealand was a party to the

---

[64] The law applicable to claims in tort is determined by the Private International Law (Choice of Law in Tort) Act 2017. The default rule is that tort claims are governed by the law of the country in which the events constituting the tort in question occur, unless the Court is satisfied that in all the circumstances it is substantially more appropriate for the law of another country to be the applicable law: ss 8-9.

Convention, and the Court treats requests for assistance as if they were made under the Hague Convention.[65]

4.4    The powers of the Court in response to a request are specified in s 185:

> "**185 Power of High Court to give effect to application for assistance**
>
> (1)    If this section applies, the High Court or a Judge may—
>
>> (a)    order that any provision for the taking of evidence in New Zealand that the High Court or the Judge considers appropriate for giving effect to the request to which the application relates, be made:
>>
>> (b)    include in that order a requirement for any specified person to do any specified thing that the High Court or the Judge considers appropriate for that purpose.
>
> (2)    An order under subsection (1) may include, without limitation, provision—
>
>> (a)    for the examination of witnesses, either orally or in writing at any agreed time or at any specified time and place:
>>
>> (b)    for the production of documents:
>>
>> (c)    for the inspection, photographing, preservation, custody, or detention of any property:
>>
>> (d)    for the taking of samples of any property and the carrying out of any experiments on or with any property:
>>
>> (e)    for the medical examination of any person:
>>
>> (f)    without limiting paragraph (e), for the taking and testing of samples of blood from any person.
>
> (3)    An order under subsection (1) may not require any particular steps to be taken unless they are steps that can be required to be taken by way of obtaining evidence for the purposes of civil proceedings in the High Court (whether or not proceedings of the same description as those to which the application for the order relates).
>
> (4)    Subsection (3) does not preclude the making of an order requiring a person to give evidence (either orally or in writing) otherwise than on oath if this is asked for by the requesting court.
>
> (5)    An order under subsection (1) may not require a person—
>
>> (a)    to state what documents relevant to the proceedings to which the application for the order relates are or have been in the person's possession, custody, or power:

---

[65] *Certain Underwriters at Lloyd's London v Boles* [2015] NZHC 1361.

> (b)   to produce any documents other than particular documents specified in the order as being documents appearing to the court making the order to be, or to be likely to be, in the person's possession, custody, or power and relevant to the proceedings.
>
> (6)   A person who, pursuant to an order under subsection (1), is required to attend at any place, is entitled to the same conduct money and payment for expenses and loss of time as on attendance as a witness in civil proceedings before the High Court.
>
> (7)   An order made under subsection (1) may be enforced in the same manner as if it were an order made by the High Court or Judge in proceedings pending in the High Court or before the Judge."

4.5    The Court may (only) grant relief that could be granted in civil proceedings in the High Court, and the following principles apply:[66]

- The court's overall objective is to balance the importance of comity to the requesting court with the need to protect witnesses from oppressive requests.

- Testimony may only be sought for the purpose of collecting evidence for trial, not obtaining information or conducting an investigation. (As noted [below] the Act expressly limits the orders that may be made for the production of documents, to exclude investigatory requests.)

- The court will assess whether the intended witnesses can reasonably be expected to have relevant evidence to give on the topics in question. The court must be satisfied that the evidence is likely to be relevant and thus admissible in terms of s 7 of the Evidence Act.

- At the same time, the court will consider relevance only "in broad terms", recognising that the ultimate assessment of relevance is a matter for the trial court. It follows that the court will only decline requests on relevance grounds in the clearest of cases.

4.6    While the Court has a discretion, it will take requests from foreign courts seriously, and has emphasised the importance of comity in responding to them.[67] While applications under s 185 of the Evidence Act are uncommon, they have almost always been granted.[68]

4.7    The proposition in the Brief that "compulsory depositions are not permitted in New Zealand" is wrong. Section 185(2) empowers the Court to make an order for the oral

---

[66] As summarised in Hook & Wass, above n 61, at [3.120], based on *Hagaman v Fairbank* [2010] NZCA 526, (2010) 20 PRNZ 68 at [33]–[46]; *Republic of Kazakhstan v Mega Ltd* [2016] NZHC 963, [2016] NZAR 810 at [36]-[39].

[67] *Hagaman v Fairbank*, above n 66, at [41].

[68] According to my research, nine applications have been decided under s 185 of the Evidence Act. Out of these nine applications, all but one were granted (the ninth being denied on the basis of a specific statutory exclusion for Crown agents which does not appear to be applicable in this case): see *Royal Caribbean Cruises Ltd v Tourism New Zealand Ltd* [2024] NZHC 2265.

examination of witnesses, and the High Court has made orders requiring the deposition of witnesses for the purpose of United States proceedings.[69]

4.8    The Court also has the power to order the production of documents. Section 185(5) limits this power to orders for production of documents to avoid fishing expeditions, and means that s 185 is focused on collection of documents for evidence rather than authorising the full breadth of a discovery exercise.[70] However, the mere fact that the foreign court's requests arises out of the discovery phase of proceedings is not disqualifying, provided that the order is limited to requiring the production of specified documents in the manner of a subpoena duces tecum.[71]

## 5.    The nature of a permanent residence visa

5.1    You have asked me to address the nature, conditions and standing of a permanent residence visa under New Zealand law.

5.2    A permanent residence visa is a form of "residence class visas" issued under the Immigration Act 2009 which entitle the holder to visit, stay and work in New Zealand.[72] A person may apply for a permanent resident visa if they have (among other requirements) held a resident visa continuously for at least 24 months and can demonstrate a commitment to New Zealand and meet character requirements.[73] To show a commitment to New Zealand, the applicant must have: spent at least 184 days in New Zealand in each of the previous 12 month periods; have been assessed as having tax residence; made a qualifying business investment; established a business in New Zealand for at least 12 months; or established a base in New Zealand.[74] The character requirements are that the person has not been convicted of specific crimes, and does not pose a risk to security, public order, or the public interest.[75]

5.3    Once an applicant has satisfied the authorities of those requirements and obtained a permanent residence visa, they are not required to spend any particular period of time in New Zealand or maintain any particular connection with the country. It follows that a person who is the holder of a permanent residence visa—and may in shorthand be described as a "permanent resident"—may not in fact be resident in New Zealand at all,

---

[69] *Hagaman v Fairbank*, above n 66. See also *Dalian Deepwater Developer Ltd v Dybdahl* [2015] NZHC 151, [2015] 3 NZLR 260, discussing the power to make an order under s 6 of the Courts (Remote Participation) Act 2010.

[70] This provision was adapted from s 2(3) of the Evidence (Proceedings in Other Jurisdictions) Act 1975 (UK). It was designed to present fishing expeditions and with United States discovery procedures in mind.

[71] *Republic of Kazakhstan v Mega Ltd*, above n 66, at [49].

[72] Immigration Act 2009, s 73.

[73] New Zealand Immigration *Operation Manual* (updated 12 March 2023) at [RV2.5].

[74] At [RV2.5.1]–[RV2.5.20] (paraphrased).

[75] At [A5].

whether permanently or otherwise. In essence, someone who holds a permanent residence visa is considered, under New Zealand law, a foreign citizen who has a right to visit, reside and work in New Zealand when they please. It does not confer the same status as New Zealand citizenship.

5.4     The circumstances in which a permanent residence visa can be revoked are narrow, such as holding the visa under a false identity; obtaining the visa by fraud, forgery or misinformation; the discovery of new information as to character within 5 years after obtaining a residence visa; conviction of certain criminal offences; and threat to security.[76]

Yours sincerely,

Jack Wass

---

[76] Immigration Act, ss 158–163.

**APPENDIX – RELEVANT STATUTORY PROVISIONS**

### Schedule 3, Accident Compensation Act 2001

## Schedule 3
## Cover for mental injury caused by certain acts dealt with in Crimes Act 1961

s 21(2)

**Section**

| | |
|---|---|
| 124A | Indecent communication with young person under 16 |
| 128B(1) | Sexual violation |
| 129(1) | Attempted sexual violation |
| 129(2) | Assault with intent to commit sexual violation |
| 129A(1) | Inducing sexual connection by threat |
| 129A(2) | Inducing indecent act by threat |
| 130 | Incest |
| 131(1) | Sexual connection with dependent family member |
| 131(2) | Attempted sexual connection with dependent family member |
| 131(3) | Indecent act with dependent family member |
| 131B | Meeting young person following sexual grooming, etc |
| 132(1) | Sexual connection with child under 12 |
| 132(2) | Attempted sexual connection with child under 12 |
| 132(3) | Indecent act on child under 12 |
| 134(1) | Sexual connection with young person under 16 |
| 134(2) | Attempted sexual connection with young person under 16 |
| 134(3) | Indecent act on young person under 16 |
| 135 | Indecent assault |
| 138(1) | Exploitative sexual connection with person with significant impairment |
| 138(2) | Attempted exploitative sexual connection with person with significant impairment |
| 138(4) | Exploitative indecent act with person with significant impairment |
| 142A | Compelling indecent act with animal |
| 194 | Assault on a child, or by a male on a female. For the purposes of this schedule, section 194 of the Crimes Act 1961 must be regarded as relating only to situations where a female sexually assaults a child under 14 years old. |
| 201 | Infecting with disease |
| 204A | Female genital mutilation |
| 204B | Further offences relating to female genital mutilation |

Schedule 3: amended, on 7 May 2015, by section 4(1) of the Accident Compensation (Cover for Mental Injury—Indecency Offences) Amendment Act 2015 (2015 No 45).

Schedule 3: amended, on 7 May 2015, by section 4(2) of the Accident Compensation (Cover for Mental Injury—Indecency Offences) Amendment Act 2015 (2015 No 45).

Schedule 3: amended, on 20 May 2005, by section 10 of the Crimes Amendment Act 2005 (2005 No 41).



# JACK WASS
BARRISTER

BARRISTER AND SOLICITOR OF THE HIGH COURT OF NEW ZEALAND (2009)
BARRISTER OF THE SUPREME COURT OF VICTORIA, AUSTRALIA (2015)

## Overview

Jack practises civil and commercial litigation from Stout Street Chambers in Wellington, where he has practised as a barrister since his admission to the Bar in 2009. The focus of his work is cross-border disputes, including private international law, public international law and international arbitration. He is recognised for his specialty expertise in these areas, and has appeared in many leading cases.

## Educational Background

| | |
|---|---|
| **LLM** (First Class) *(University of Cambridge)* | 2013 |
| 3 Verulam Buildings Price for First in International Commercial Litigation | |
| **LLB** (Hons) (First Class) (*Victoria University of Wellington*) | 2008 |
| Quentin-Quentin Baxter LLM Prize in Public and International Law | |
| **BA** *(Victoria University of Wellington)* | 2008 |

## Professional Experience

**Civil and commercial litigation**. Jack has a wide civil litigation practice with a particular focus on cross-border disputes. Matters include:

- *Kea Investments Ltd v Wikeley Family Trustee Ltd* (multiple decisions of High Court and Court of Appeal), a multi-million dollar cross-border fraud claim

- *Salih v Almarzooqi* [2023] NZCA 645, [2024] 2 NZLR 27 (enforcement of Islamic marriage contract)

- *Body Corporate DPS 91535 v 3A Composites GmbH* [2023] NZCA 645 (cross-border product liability)

- *Whyte v a2 Milk Ltd* [2023] NZHC 22, [2023] 2 NZLR 486 (jurisdiction over class actions)

- *Commerce Commission v viagogo AG* [2019] NZCA 472, [2019] 3 NZLR 559 (leading decision on international jurisdiction and interim relief)

- *McGougan v DePuy International Ltd* [2018] NZCA 91, [2018] 2 NZLR 916 (territorial application of Accident Compensation Act)

- *Kuwait Finance House (Bahrain) BSC v Teece* [2017] NZHC 1308, [2018] 2 NZLR 257 (enforcement of foreign judgments)

**Current matters** on which Jack is instructed include:

- a cross-border tort claim

- acting for the administrator of an estate with assets in multiple jurisdictions;

- in a cross-border breach of trust claim;

- in proceedings under the Employment Relations Act 2000 concerning exploitation of migrant workers;

- in proceedings under the Accident Compensation Act 2001

**Advice and expert evidence.** Jack is frequently asked to advise on New Zealand law as it relates to cross-border proceedings in New Zealand and overseas, including:

- Advising the New Zealand Government on questions of sovereign immunity in foreign courts

- Advising New Zealand Government on consistency of treaty commitments under negotiation with New Zealand law

- Providing advice for the purpose of foreign proceedings concerning New Zealand trusts

- Providing an expert opinion for proceedings in Taiwan concerning New Zealand law

- Providing advice on New Zealand law issues in relation to proceedings in countries including the United States, Canada, the United Kingdom, Australia, Asia and Europe.

## Law Reform and Publications

**Legislative advice**. Jack is a member of the New Zealand Law Society Law Reform Committee, and has appeared before Parliamentary Select Committees on a number of occasions, including:

- He was the co-author of a submission on the Private International Law (Choice of Law in Tort) Act 2017. He appeared before the Select Committee and gave advice on the relationship between tort claims and the ACC Act which was quoted and acknowledged in Parliamentary debates

- He has drafted or presented submissions on numerous pieces of legislation both on behalf of the New Zealand Law Society and his own capacity (including the Arbitration Amendment Act 2016, Arms Brokering Amendment Bill, International Crimes and International Criminal Court Amendment Act 2020)

**Law reform.** Jack has a longstanding interest in law reform, including:

- Jack has assisted the New Zealand Law Commission on various projects, on both a paid and pro bono basis, including the review of Property (Relationships) Act 1976 (2019) and the review of Succession Law (2021)

- Jack has advised New Zealand government departments and agencies on cross-border issues arising in the drafting of legislation, the negotiation of international treaties and the exercise of executive decision-making

**Publications**. Jack frequently publishes on his specialist areas:

- Jack is the co-author of *The Conflict of Laws in New Zealand* (LexisNexis, 2020), the first comprehensive textbook on the subject in New Zealand and joint winner of the JF Northey Prize for best legal text published in New Zealand

- Jack has published numerous articles in peer-reviewed and practitioner journals in New Zealand and overseas, including the British Year Book of International Law, International and Comparative Law Quarterly (UK) and New Zealand Business Law Quarterly

# EXHIBIT 3



 **amandapalmer** ✓ · Follow
Boston, Massachusetts

 **amandapalmer** ✓  37w
A personal announcement so important I
even put on lipstick for it people.

Hi Boston. I've moved back home.

Sorry for all the vague-posting lately but
it's been a...strange summer. It's a long
story and it didn't all fit here, so please go
read it on my patreon, where the post is
free to the public. Link in stories.

Here's the important bit:

After almost twenty years of non-stop
travel and hotels and couch-surfing and
tour busses, then living out of a suitcase in
Aotearoa New Zealand for two and a half
years (after getting waylaid there in 2020
when COVID hit), then living in a bit of a
temporary stone hallway in Woodstock,
New York, for two years, I'm finally at

            

**7,120 likes**
September 17, 2024

Log in to like or comment.

# EXHIBIT 1

**From:** Mia Dabbous <████████████.co.nz>
**Subject: Re: Extension help**
**Date:** 3 July 2024 at 9:41:19 PM GMT+1
**To:** Scarlett Wynter <████████████████>

Hello Scarlett,

I was online for our session and have just disconnected the call. I'm not sure if something came up for you as you weren't online.

I realise you left NZ in a semi-planned way so we didn't have a chance to have a conversation about what support would look like for you when you're in the UK, or what your summer plans are (I'm mindful uni doesn't start for a few weeks).

As mentioned previously, we can't continue ACC-funded therapy when you're living overseas. I will need to close your file with them for now. You can receive support again when you return to NZ. My recommendations is that you're well supported until uni starts and that you get in contact with student services when classes begin.

In case I don't hear back from you, I wish you all the best. I've enjoyed working with you and I hope things start to look up from now on.

Kind regards,

Mia Dabbous – Registered Psychologist
Email: ████████████.co.nz

# EXHIBIT 2

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| SCARLETT PAVLOVICH,<br><br>                              Plaintiff,<br><br>          v.<br><br>NEIL GAIMAN and AMANDA PALMER,<br><br>                              Defendants. | Case No.: 3:25-CV-00078-JDP<br><br><br>**DECLARATION OF PLAINTIFF SCARLETT PAVLOVICH** |

I, SCARLETT PAVLOVICH, declare and affirm under the penalty of perjury under the laws of the United States of America:  The information contained in this Declaration is correct to the best of my knowledge, information, and belief.  This Declaration is made in good faith to assert the truthfulness of the following statements:

1.      My legal name is Molly Scarlett Pavlovich. I am over the age of eighteen, and I am fully competent to make this declaration and testify to the matters asserted herein. The facts stated herein are based on my personal knowledge.

2.      I am citizen of New Zealand. However, I do not live in New Zealand and have not lived there since June of 2024.

3.      I have been living in St. Andrews, Scotland where I am attending university since August of 2024 and continue to live there with plans to remain in Scotland for years to come.

4.      Because of the abuse I suffered, I have no intention whatsoever of ever returning to New Zealand either to live or even visit and I don't consider New Zealand my home regardless of the fact that I have citizenship in that country.

5.      I am currently going through a process with the Scottish Women's Rights Center for discretionary leave to remain indefinitely in the UK.

1

6.    I met Amanda Palmer when I was 22 years old. At that time, I had no money, without stable means of income or secure housing, and in a fragile state with my mental health.

7.    On February 1, 2022, I accepted an offer from Amanda Palmer to work as a nanny, babysitting her child with Neil Gaiman. This offer of employment included watching their child at their separate homes and completing various household services at both houses.

8.    Amanda Palmer, Neil Gaiman and myself are the only people with knowledge of the agreement I made with Amanda Palmer to work as a live-in nanny for her and Neil Gaiman.

9.    On February 4, 2022, I met Neil Gaiman for the first time at the ferry terminal and then a few hours later I proceeded to Neil Gaiman's home where he was with his son.

10.    On February 4, 2022, Neil Gaiman raped me for the first time.

11.    Between February 4, 2022, and February 25, 2022, I fulfilled my work obligations of working as a nanny and completing other household services for Amanda Palmer and Neil Gaiman. Throughout this time, I was being sexually abused by Neil Gaiman and received no compensation for my nanny and household services.

12.    As of February 26, 2022, after enduring weeks of sexual abuse and while performing nanny services, I still had not received any compensation for the services I completed.

13.    March 7, 2022, I told Amanda Palmer that Neil Gaiman had been sexually abusing me.

14.    Eventually I received payment on March 25, 2022 for the nannying services I performed, but this was only after the sexual abuse had stopped when Neil Gaiman left the country.

15.    Neil Gaiman required that I sign the Independent Contractor Agreement after my employment with Neil Gaiman and Amanda Palmer had been terminated.

16.    Neil Gaiman sexually abused me either when I was home alone with him, or when his minor child was in the house. There were never any other adults present who witnessed the sexual abuse I experienced.

17.    I am currently a student attending university with very few, if any, assets, and would not be able to provide security for Neil Gaiman or Amanda Palmer's defense costs.

18.    Where I live in St. Andrews, Scotland, is approximately 11,000 miles away from and 13 hours behind in time of Auckland, New Zealand.

19.    Living in Scotland prevents me from seeing any New Zealand-based therapists in-person.

20.    I have attempted to get therapy/rehabilitative care while living in Scotland by calling and was told by Mia, a therapist who works with the ACC, that I am not able to receive any rehabilitative care or therapy services through the ACC because I was living abroad.

21.    I received an email from Mia that confirmed I cannot receive any therapy/rehabilitative care through the ACC because I live out of the country. A true and correct copy of that email is attached hereto as **Exhibit 1.**

22.    Because of my current status as a full-time student attending university in St. Andrews, Scotland, I do not have the financial means or resources to travel to New Zealand.
I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Executed on April 11, 2025.

_____
SCARLETT PAVLOVICH

# EXHIBIT 3

Instagram  Log In  Sign Up



 **amandapalmer** ✔ · Follow
Boston, Massachusetts                    •••

 **amandapalmer** ✔  37w
A personal announcement so important I
even put on lipstick for it people.

Hi Boston. I've moved back home.

Sorry for all the vague-posting lately but
it's been a...strange summer. It's a long
story and it didn't all fit here, so please go
read it on my patreon, where the post is
free to the public. Link in stories.

Here's the important bit:

After almost twenty years of non-stop
travel and hotels and couch-surfing and
tour busses, then living out of a suitcase in
Aotearoa New Zealand for two and a half
years (after getting waylaid there in 2020
when COVID hit), then living in a bit of a
temporary stone hallway in Woodstock,
New York, for two years, I'm finally at

            

**7,120 likes**
September 17, 2024

Log in to like or comment.

# EXHIBIT 4

United States District Court
District of Massachusetts

_____

Scarlett Pavlovich

           Plaintiff

      VS

Amanda Palmer

           Defendant

_____

PROOF OF SERVICE

File/Index No.: 25 CV 10263
Issued On: 2/4/2025
Alt File/Index No.:
Calendar No.:

**SERVICE UPON: Amanda Palmer**

State/Commonwealth/Locale of: Massachusetts, County/City of: ___LEXINGTON___ : ss

Cynthia Paris does hereby declare, certify and/or affirm as follows: I am not a party to the within action, am over the age of 18 years and reside in the State of Massachusetts.

On 2/27/2025 at 2:15 PM at 14 Glen Road South, Lexington, MA 02420, I effected service of process of the following documents: Summons & Complaint upon Amanda Palmer, a/the defendant in this matter/proceeding:

By delivering to and leaving a true copy thereof with Amanda Palmer personally.

I describe the recipient at the time of service as follows: Gender: Female Race/Skin: white Age: 40's Height: 5-4 Glasses: Weight: 130 Hair: brown

Declared/Certified/Affirmed on

___3 | 25 | 2025___

Cynthia Paris
Target Legal Process Worldwide Corp.
100 Church Street, Suite 800
New York, NY 10007
(212) 227-9600



Order #:R90764

Personal Service by Personal Delivery

# EXHIBIT 5



```
8 0 7 8 0 5 6
Tx:4056798
```

QUIT CLAIM DEED

DOCUMENT NO.

**638869**

**DUNN COUNTY, WI**
**REGISTER OF DEEDS**
**HEATHER M. KUHN**

**RECORDED ON**
**11/15/2019 12:36 PM**
REC FEE:        30.00
FEE EXEMPT #: 3
PAGES: 1

Mary T. Gaiman, a single person, quit claims
to Neil R. Gaiman, the following described
real estate in Dunn County, State of
Wisconsin:

RETURN TO:

Michael J. Fairchild
Attorney at Law
508 Wilson Ave.
Menomonie, WI 54751

Parcel Identification Nos.
016-16228132813-00005,
-00006, -00007, -00008

The South Half of the Northeast Quarter (S½ of NE¼) of Section Twenty-
Eight (28), Township Twenty-Eight (28) North,  Range Thirteen (13) West,
Town of Menomonie.

This is homestead property.

This deed corrects an incomplete description contained in Document No.
636273.

Dated this 7th day of November, 2019.

_____ (SEAL)        _____ (SEAL)

*Mary T. Gaiman

----------AUTHENTICATION----------------------------ACKNOWLEDGMENT--------------------

Signature_____

_____
authenticated this _____day of
_____, 2019.

_____
             \

_____
*
TITLE: MEMBER STATE BAR OF WISCONSIN

State of Wisconsin )
                   ) ss.
Dunn County        )
Personally came before me
this _7th_ day of _November_, 2019.

the above named _Mary T. Gaiman_

_Came before me._

_____

Notary Public _Alexander R. Fairchild_

Dunn County, Wisconsin
My commission expires on: _10/8/2023_

THIS INSTRUMENT WAS DRAFTED BY
Michael J. Fairchild
Attorney at Law
508 Wilson Avenue
Menomonie, WI  54751



UNOFFICIAL COPY

# EXHIBIT 6

# Dunn County, WI

## Summary

| | |
|---|---|
| Parcel Number | 1701622813281300012 |
| Alt. Parcel Number | |
| Property Address | E3988 550TH AVE |
| Abbreviated Legal Description | PT. SWNE PT. SENE KNOWN AS LOT 1 CSM 4869 VOLUME 24 PAGE 154 OF SURVEYS RECORDED AS 661752 <br> (Note: Not to be used on legal documents) |
| Sec-Twp-Rng | 28-28N-13W |
| Acres | 12.6 |
| Municipality | TOWN OF MENOMONIE |

[View Map](#)

## Owner

CURRENT OWNER
NEIL R GAIMAN
1990 S BUNDY DR
STE 850
LOS ANGELES, CA 90025

## Valuation

| Assessed Year | 2024 | 2023 |
|---|---|---|
| Land Value | $62,000.00 | $62,000.00 |
| Building Value | $317,600.00 | $317,600.00 |
| Total Value | $379,600.00 | $379,600.00 |
| Estimated Fair MarketValue | $652,700.00 | $596,800.00 |

## Tax History

| Tax Year | 2024 | 2023 |
|---|---|---|
| Net Tax | $7,165.00 | $6,664.74 |
| Special Assessments | $0.00 | $0.00 |
| Woodland\Forest | $0.00 | $0.00 |
| Total | $0.00 | $0.00 |

## Tax Payments

| Year | PaidDate | Amount | Paid |
|---|---|---|---|
| 2024 | 1/13/2025 | $7,165.00 | $3,582.50 |
| 2023 | 4/24/2024 | $6,664.74 | $6,664.74 |

## Sales

| Document Number | Type | Date | Vol / Page | Sale Amount |
|---|---|---|---|---|
| 661752 | 17 - CERTIFIED SURVEY MAP | 8/3/2022 | 24 / 154 | $0 |

**No data available for the following modules:** Tax Deductions.





**Dunn County,WI Web Portal - Property Summary**

Search powered by
**GCS**

Report-/Print engine
List & Label ® Version 19:
Copyright combit® GmbH
1991-2013

Property: 1701622813281300009

| Tax Year | Prop Type | Parcel Number | Municipality | Property Address | Billing Address |
|---|---|---|---|---|---|
| 2025 ▾ | Real Estate | 1701622813281300009 | 016 - TOWN OF MENOMONIE | | NEIL R GAIMAN<br>1990 S BUNDY DR STE 850<br>LOS ANGELES CA 90025 |

| Tax Year Legend: | 💲 = owes prior year taxes | ❌ = not assessed | 💲 = not taxed | Delinquent | Current |
|---|---|---|---|---|---|

## Summary

| Property Summary | |
|---|---|
| Parcel #: | 1701622813281300009 |
| Alt. Parcel #: | |
| Parcel Status: | Current Description |
| Creation Date: | 10/7/2022 |
| Historical Date: | |
| Acres: | 2.500 |

| Property Addresses |
|---|
| No Property Addresses were found |

| Owners | | | |
|---|---|---|---|
| **Name** | **Status** | **Ownership Type** | **Interest** |
| GAIMAN, NEIL R | CURRENT OWNER | | 100 |
| GAIMAN, MARY T & NEIL R | FORMER OWNER | | |

| Parent Parcels | |
|---|---|
| **Parcel Number** ▲ | **Creation Date** |
| 1701622813281300006 | 11/13/2010 |

| Child Parcels |
|---|
| No Child Parcels were found |

| Abbreviated Legal Description |
|---|
| (See recorded documents for a complete legal description) |
| PT. SW NE LYG SRLY OF HWY AND NRLY OF GILBERT CREEK EXC. CSM 4869 |

| Public Land Survey - Property Descriptions | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Primary** | **Section** ▲ | **Town** | **Range** | **Qtr 40** | **Qtr 160** | **Gov Lot** | **Block/Condo Bldg** | **Type** | **# Plat** |
| ☑ | 28 | 28 N | 13 W | SW | NE | | | | METES AND BOUNDS |

| District | | |
|---|---|---|
| **Code** ▲ | **Description** | **Category** |
| 0100 | CHIPPEWA VALLEY TECH | TECHNICAL COLLEGE |

| | DUNN COUNTY | OTHER DISTRICT |
| | LOCAL | OTHER DISTRICT |
| | STATE OF WISCONSIN | OTHER DISTRICT |
| 3444 | SCH D MENOMONIE AREA | REGULAR SCHOOL |
| | MENOMONIE FD | OTHER DISTRICT |
| GA | GENERAL AGRICULTURE | OTHER DISTRICT |

| Associated Properties |
| --- |
| No Associated properties were found |

## Building Information

| Buildings |
| --- |

## Assessments

| Assessment Summary |
| --- |

Estimated Fair Market Value: **0**
Assessment Ratio: **0.0000**
Legal Acres: **2.500**

| 2025 valuations | | | | |
| --- | --- | --- | --- | --- |
| **Class** | **Acres** | **Land** | **Improvements** | **Total** |
| G1 - RESIDENTIAL | 2.500 | 26500 | 147100 | 173600 |
| **ALL CLASSES** | **2.500** | **26500** | **147100** | **173600** |

| 2024 valuations | | | | |
| --- | --- | --- | --- | --- |
| **Class** | **Acres** | **Land** | **Improvements** | **Total** |
| G1 - RESIDENTIAL | 2.500 | 26500 | 147100 | 173600 |
| **ALL CLASSES** | **2.500** | **26500** | **147100** | **173600** |

## Taxes

| **Taxes have not been finalized for the year 2025** |
| --- |

## Document History

| Doc # | Type | Date | Vol / Page | # Pages | Signed Date | Transfer Date | Sale Amount | # Properties |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 661752 | CERTIFIED SURVEY MAP | 8/3/2022 | 24 / 154 | 0 | | 6/29/2022 | $0.00 | 0 |
| 638869 | QUIT CLAIM DEED | 11/15/2019 | | 0 | | 11/7/2019 | $0.00 | 4 |
| 561229 | MISC | 4/27/2009 | | | | 4/27/2009 | $0.00 | 1 |
| 508040 | WD | 1/21/2004 | 1261 / 185 | | | | $0.00 | 0 |

# EXHIBIT 7



https://bsky.app/profile/neilhimself.neilgaiman.com/post/3ke2d2k6vxs2r

# EXHIBIT 8

# Exhibit 10



https://x.com/neilhimself/status/1305552827008385024

# EXHIBIT 9

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

Pavlovich
_____
                Plaintiff(s),

        v.                                          Case No.   25-cv-00078
                                                    _____

Gaiman
_____
                Defendant(s).


MOTION TO APPEAR *PRO HAC VICE*


Andrew B. Brettler              of    Berk Brettler LLP
_____              _____
       Attorney                                   Firm

respectfully requests that this Court grant admission *pro hac vice* in the above matter. I certify that I am an
attorney in good standing licensed to practice in   California
                                                    _____
                                                          Jurisdiction


Dated this  4th  day of        March,   2025
                          _____


s/ Andrew B. Brettler
_____

    Name      Andrew B. Brettler
              _____

    Firm      Berk Brettler LLP
              _____

    Address   9119 W. Sunset Blvd.
              _____

              _____

    City      West Hollywood        State  CA   Zip Code  90069

    E-Mail    abrettler@berkbrettler.com
              _____

    Phone         +1 (310) 278-2111
              _____

# EXHIBIT 10

 The State Bar *of California*

Log in | News | Forms | Contact

**PUBLIC:**   Need Legal Help   |   Complaints & Claims   |   Free Legal Information   |   Discipline   |   Public Trust Liaison   |   En español

Legal Specialist Search

Finding the Right Lawyer

Attorney Search

Provisionally Licensed Lawyers

Legal Guides

Lawyer Referral Service

Problem with a Lawyer

 Select Language ▼

## Attorney Profile

### Andrew Brad Brettler #262928

**License Status: Active**

Address: Berk Brettler LLP, 9119 W Sunset Blvd, West Hollywood, CA 90069-3106
Phone: 310-278-2111  |  Fax: 310-550-7055
Email: **abrettler@berkbrettler.com**  |  Website: **www.berkbrettler.com**

**More about This Attorney** ▾

### License Status, Disciplinary and Administrative History

The table below shows an attorney's license status changes, disciplinary actions, and administrative actions. Some administrative suspensions are subject to automatic removal from the attorney profile page pursuant to the State Bar's **policy on removal of administrative actions**. Administrative suspensions are non-disciplinary actions resulting from noncompliance with administrative requirements, such as the requirement to pay licensing fees or comply with Minimum Continuing Legal Education. Administrative suspensions that meet the criteria in the State Bar's policy on removal of administrative actions would not be displayed below.

| Date | License Status ❶ | Discipline ❶ | Administrative Action ❶ |
|------|------------------|--------------|-------------------------|
| **Present** | Active | | |
| **5/19/2009** | Admitted to the State Bar of California | | |

# EXHIBIT 11

| ○ Edinburgh | ⇄ ○ Auckland | 📅 Wed, Jun 11 ‹ › | Wed, Jun 25 ‹ › |

All filters  Stops ▾  Airlines ▾  Bags ▾  Price ▾  Times ▾  Emissions ▾  Connecting airports ▾  Duration ▾

| Best ⓘ | Cheapest from **$1,559** ⓘ |

## Top departing flights

Ranked based on price and convenience ⓘ   Prices include required taxes + fees for 1 adult. Optional charges and bag fees may apply. Passenger assistance info.

Sorted by top flights ↑↓

| | | | | | |
|---|---|---|---|---|---|
| 🇶 | **3:10 PM – 2:45 AM**[+2]<br>Qatar Airways · British Airways | 24 hr 35 min<br>EDI–AKL | 1 stop<br>1 hr 45 min DOH | 1,234 kg CO2e<br>-6% emissions ⓘ | **$1,562**<br>round trip | ⌄ |
| ◢ | **4:35 PM – 9:50 AM**[+2]<br>British Airways, Air New Zealand | 30 hr 15 min<br>EDI–AKL | 2 stops<br>LHR, HKG | 1,108 kg CO2e<br>-15% emissions ⓘ | **$1,691**<br>round trip | ⌄ |
| Emirates | **9:50 PM – 9:50 AM**[+2]<br>Emirates | 25 hr<br>EDI–AKL | 1 stop<br>1 hr 50 min DXB | 1,297 kg CO2e<br>Avg emissions ⓘ | **$1,762**<br>round trip | ⌄ |

| 📊 Prices are currently typical | View price history ⌄ |

〜 Track prices ⓘ Jun 11 – 25 ⬤▭   Any dates ⬤▭       📅 Date grid   📈 Price graph

## Other departing flights

| | | | | | |
|---|---|---|---|---|---|
| 🇶 | **3:10 PM – 4:45 AM**[+3]<br>Qatar Airways | 50 hr 35 min<br>EDI–AKL | 1 stop ⚠<br>27 hr 45 min DOH | 1,234 kg CO2e<br>-6% emissions ⓘ | **$1,559**<br>round trip | ⌄ |
| ◢ | **1:20 PM – 3:45 PM**[+2]<br>KLM, China Eastern | 39 hr 25 min<br>EDI–AKL | 2 stops<br>AMS, PVG | 1,352 kg CO2e<br>Avg emissions ⓘ | **$1,776**<br>round trip | ⌄ |
| ◢ | **9:50 PM – 12:40 PM**[+2]<br>Emirates, Qantas | 27 hr 50 min<br>EDI–AKL | 2 stops<br>DXB, MEL | 1,374 kg CO2e<br>Avg emissions ⓘ | **$1,867**<br>round trip | ⌄ |
| ◢ | **4:50 PM – 9:50 AM**[+2]<br>Turkish Airlines, Air New Zealand | 30 hr<br>EDI–AKL | 2 stops<br>IST, HKG | 1,350 kg CO2e<br>Avg emissions ⓘ | **$2,911**<br>round trip | ⌄ |
| ◢ | **7:40 AM – 10:50 PM**[+1]<br>British Airways, Malaysia Airlines | 28 hr 10 min<br>EDI–AKL | 2 stops<br>LHR, KUL | 1,173 kg CO2e<br>-10% emissions ⓘ | **$3,316**<br>round trip | ⌄ |
| ◢ | **1:50 PM – 5:30 AM**[+2]<br>United, Air New Zealand | 28 hr 40 min<br>EDI–AKL | 2 stops<br>EWR, IAH | 1,673 kg CO2e<br>+28% emissions ⓘ | **$21,726**<br>round trip | ⌄ |

⌄  View more flights

# EXHIBIT 12

