United States District Court
District of Massachusetts

| | |
|---|---|
| Scarlet Pavlovich, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. |
| ) | 25-10263-NMG |
| Amanda Palmer, ) | |
| ) | |
| Defendant. ) | |

MEMORANDUM & ORDER

GORTON, J.

This case arises from claims of human trafficking and conspiracy brought by plaintiff, Scarlett Pavlovich ("plaintiff" or "Pavlovich"), against Amanda Palmer ("defendant" or "Palmer"), the former wife of her alleged abuser, Neil Gaiman ("Gaiman"). Defendant has moved to dismiss for forum non conveniens.[1] For the following reasons, the motion to dismiss will be allowed.

---

[1] Defendant also filed motions to dismiss for failure to state a claim and for inapplicable extraterritorial conduct under the Trafficking Victims Protection Act ("TVPA"). The Court declines to reach the merits of those motions.

1

## I. Facts

The Court accepts as true all well-pled factual allegations in the complaint. Pavlovich is a citizen of New Zealand and resided therein during the relevant time period. Palmer is a U.S. citizen who was lawfully domiciled in New Zealand during the relevant time period. In 2020, the two met and became acquainted in Auckland, New Zealand. At the time Pavlovich was twenty-two years old, financially insecure and had spent time unhoused. She also had a history of mental health crises.

In February, 2022, Palmer offered to pay Pavlovich to babysit the child she shared with Gaiman, to whom she was married but from whom she was separated at the time. The job required Pavlovich to spend time at the separate homes of both Palmer and Gaiman on Waiheke Island, which is accessible only by a 40-minute ferry ride from Auckland. Pavlovich did not know nor have reason to know that Gaiman had previously been accused of sexually assaulting and/or raping numerous women.

On February 4, 2022, while Pavlovich was babysitting at Gaiman's residence, he sexually assaulted her. During the incident Gaiman stated Palmer had told him that he could not "have [Pavlovich]," which made him feel "he had to have [her]." After the attack, Pavlovich returned to Palmer's residence and

2

babysat as planned for the remainder of the weekend. She did not mention the incident to Palmer.

Soon thereafter, Palmer offered Pavlovich a job as a live-in nanny. The job again required Pavlovich to spend time at both residences. Pavlovich accepted the offer after encouragement and promises of payment and career assistance by Palmer and Gaiman. Gaiman repeatedly raped and/or sexually assaulted Pavlovich during the time she worked as the live-in nanny at both residences. Neither Palmer nor Gaiman paid Pavlovich for her services. As a result, Pavlovich could not afford food, transport off Waiheke Island or alternative housing.

Weeks later, Pavlovich informed Palmer about Gaiman's abuses. Palmer allegedly was not surprised and told Pavlovich that she was aware of more than a dozen other women who had been subjected to similar sexual abuse by Gaiman. Palmer never told Pavlovich about Gaiman's other victims prior to that conversation but offered to "take care" of Pavlovich, as she had done for other victims, by providing her with temporary accommodations in Auckland.

Pavlovich became suicidal while living in the temporary accommodations and was subsequently hospitalized for psychiatric

treatment. Upon her release from the hospital, Pavlovich was told she could no longer stay in the temporary accommodations but received a small amount of "rent money" from Gaiman after she signed an employment agreement backdated to February 4, 2022, the date of the first alleged rape.

Pavlovich filed a police report accusing Gaiman of sexual assault but the police took no action and she later moved to Scotland, where she currently resides and is enrolled at a university. Palmer currently lives in Massachusetts while Gaiman lives in Wisconsin.

**II. Procedural History**

In early February, 2025, plaintiff filed a complaint and demand for jury trial in this Court. She asserts five claims against Palmer: 1) human trafficking in violation of 18 U.S.C. §§1591, 1595(a) (count I); 2) human trafficking in violation of 18 U.S.C. §1589 and civil conspiracy (count II); 3) human trafficking in violation of 18 U.S.C. §§1590(a), 1595(a) and civil conspiracy (count III); 4) conspiracy to commit trafficking in violation of 18 U.S.C. §§1594, 1595(a) (count IV), and 5) negligence against Palmer for introducing plaintiff to Gaiman and failing to warn her of the unreasonable danger he posed.

Defendant now moves to dismiss all claims for forum non conveniens pursuant to Fed. R. Civ. P. 12(b)(3).

### III. Legal Standard

Forum non conveniens is a discretionary defense that empowers a district court to dismiss an action when a court abroad is the more appropriate and convenient forum. Sysco Mach. Corp. v. Cymtek Sols., Inc., 124 F.4th 32, 37 (1st Cir. 2024). Although plaintiff's chosen forum is entitled to deference, that presumption applies with less force when the plaintiff's choice is not her home forum. Id.

The moving party's burden is twofold; it must establish that (1) an adequate alternative forum is available and (2) considerations of convenience and judicial efficiency strongly favor litigating the claim in that alternative forum. Adelson v. Hananel, 510 F.3d 43, 52 (1st Cir. 2007).

#### A. Adequate Forum

An adequate forum must meet two requirements: (1) all parties are subject to that forum's jurisdiction, and (2) the parties will not be deprived of all remedies or treated unfairly, even though they may not enjoy the same benefits as they might receive in an American court. Imamura v. Gen. Elec. Co., 957 F.3d 98, 106 (1st Cir. 2020).

5

The first requirement (the forum's "availability") is typically satisfied if the defendant is amenable to service of process there. Id. As to the second requirement (the forum's "adequacy"), an alternative forum is adequate unless the remedy it provides "is so clearly inadequate or unsatisfactory that it is no remedy at all." Id.

**B. Convenience and Judicial Efficiency**

The second and more complicated inquiry involves balancing "the compendium of factors relevant to the private and public interests implicated by the case" to determine whether defendant has demonstrated that dismissal is appropriate. Relevant private interest factors include

> the relative ease of access to sources of proof; availability [and cost] of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses . . . and all other practical problems that make trial of a case easy, expeditious[,] and inexpensive.

Id. at 107. The relevant public interest factors include

> the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty.

Id. (internal quotations omitted).

IV. Analysis

A. Availability and Adequacy

It is undisputed that Palmer stipulated to service of process in New Zealand. The Court need not undertake additional analysis on availability.

Plaintiff contests the adequacy of New Zealand as an alternative forum. She argues that, because New Zealand has adopted a no-fault compensation scheme for victims of accidents and intentional torts outside of the court system ("the Accident Compensation Corporation" or "ACC"), New Zealand cannot be considered an adequate alternative forum.

The fact that plaintiff's claim in New Zealand would be handled outside of the judicial system does not necessarily mean New Zealand is an inadequate forum. Indeed, courts have consistently found New Zealand (and many other countries with similar adjudicative remedies) to be adequate alternative forums notwithstanding the lack of formal court proceedings. See, e.g., Lueck v. Sundstrand Corp., 236 F.3d 1137, 1144 (9th Cir. 2011); Imamura, 957 F.3d at 112. The relevant inquiry is not whether litigation is available but whether the remedy offered "is so clearly inadequate or unsatisfactory that it is no remedy at

all." Imamura, 957 F.3d at 106. That is plainly not the case here.

Although the ACC does not provide compensation to victims for purely emotional injuries, victims are afforded access to free mental health services to treat any emotional injury. Given that a compensatory damage award would presumably be used to pay for that kind of treatment, the Court finds such a remedy to be sufficient.

Plaintiff responds that she does not live in New Zealand and thus cannot access available services. Yet the record before this Court indicates that she was receiving government-sponsored therapy until she voluntarily left New Zealand in 2024. Thus, plaintiff has already received a remedy for her mental injuries.

The therapy provided by the ACC without cost is not the only remedy available to Pavlovich in New Zealand; she could also pursue exemplary damages for egregious conduct. Plaintiff responds that "such damages do not provide compensation for the injuries Scarlet suffered." Whether such exemplary damages are awarded specifically for her pain and suffering is irrelevant; their availability demonstrates that remedies beyond the ACC are available to her.

Although such remedies may be less comprehensive than those available in the United States, plaintiff is not without relief in New Zealand. That is all that is required under the doctrine of <u>forum</u> <u>non</u> <u>conveniens</u> for New Zealand to be deemed an adequate forum.

**B. Convenience and Judicial Economy**

The Court proceeds to consideration of the private and public interests implicated by the case and its possible transfer.

### i. Private Interests

The primary inquiry under the private interest analysis is the convenience of the parties and access to witnesses and evidence. Pavlovich contends that the case has only three key witnesses: Palmer, Gaiman and herself, none of whom currently resides in New Zealand. That argument ignores the fundamental fact that Gaiman and Palmer have both agreed to submit to the jurisdiction of New Zealand. The Court will not ignore that reality and exercise jurisdiction over parties in a civil case who would clearly be inconvenienced thereby and would prefer to proceed in New Zealand.

As for plaintiff's convenience, although the flight from the United Kingdom to New Zealand is prodigious, the flight to

9

Massachusetts is hardly convenient. In either case, Pavlovich will need to fly thousands of miles overseas, and the closer proximity of Massachusetts does not outweigh the other factors in favor of dismissal.

Pavlovich takes issue with Palmer's claim that all relevant witnesses and evidence are in New Zealand, noting that Palmer has not identified any specific testimony that would be proffered in New Zealand. The same can, however, be said of Pavlovich who has not identified any potential witness in Massachusetts other than Palmer. Furthermore, Palmer has made it clear that she is amenable to jurisdiction in New Zealand.

Finally, Pavlovich claims that dismissal of her case would make it more difficult to coordinate this case with the one against Gaiman, which has been filed in the Western District of Wisconsin. That argument is now moot because the case against Gaiman was dismissed for forum non conveniens in October, 2025.

In sum, the private interests tilt in favor of dismissal.

### ii. Public Interests

The public interest analysis, as briefed by the parties, depends upon which forum has a stronger interest in adjudicating the dispute. Notwithstanding the fact that all relevant conduct occurred in New Zealand, Pavlovich asserts that the United

States has a strong interest in hearing the case. The only support she offers for her contention is that, under the TVPA, American courts have extraterritorial jurisdiction over any offense identified in certain criminal laws prohibiting trafficking, and victims of those criminal laws may bring civil actions against the perpetrators to recover damages. Pavlovich suggests that because the criminal actions 1) have extraterritorial application and 2) allow victims to pursue civil claims, a civil action brought by a victim has extraterritorial application as well.

The problem with that reasoning is that the TVPA civil remedy does <u>not</u> apply extraterritorially, and Supreme Court precedent indicates that, in the absence of any statutory language authorizing extraterritorial application, such a civil remedy is limited to domestic application. <u>RJR Nabisco</u> v. <u>Eur. Cmty.</u>, 579 U.S. 325 (2016) (holding that RICO's civil remedies provision lacks extraterritorial application, notwithstanding the extraterritorial reach of the underlying criminal provisions).

The First Circuit has not considered whether the civil remedy provision applies extra-territorially and other appeals courts have differed in their holdings. Given such uncertainty,

11

this Court is disinclined to find that Pavlovich's civil claim has extraterritorial application. Even assuming, arguendo, that the TVPA civil remedy provision applies outside the United States, there is no caselaw support for the proposition that it is relevant to a forum non conveniens inquiry.

Having disposed of the TVPA issue, it is clear to the Court that New Zealand has a greater interest in deciding this case. Plaintiff is a citizen of New Zealand, all the underlying conduct took place in New Zealand and defendant was a lawful resident of New Zealand during the relevant time period. Common sense dictates that New Zealand is the more interested forum. As United States District Judge James D. Peterson (W.D. Wis.) observed when dismissing Pavlovich's case against Gaiman,

> [Massachusetts] jurors would be scratching their heads about how and why they were being asked to decide a dispute regarding such far away events that have nothing to do with them.

## ORDER

For the foregoing reasons, the motion to dismiss for <u>forum non conveniens</u> is **ALLOWED**.

**So ordered.**

/s/ Nathaniel M. Gorton

Nathaniel M. Gorton
Senior United States District Judge

Dated: February 6, 2026